NY Atlantic Railway v. Surface Transportation Board

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: September 23, 2010                    Decided: March 15, 2011)

Docket No. 10-1490-ag

_____

NEW YORK & ATLANTIC RAILWAY COMPANY,
COASTAL DISTRIBUTION, LLC,

*Petitioners,*

v.

SURFACE TRANSPORTATION BOARD, and UNITED STATES OF AMERICA,

*Respondents,*

and

PINELAWN CEMETERY CORPORATION and TOWN OF BABYLON ,

*Intervenors.*

_____

Before: POOLER and HALL, *Circuit Judges*, and KRAVITZ[1], *District Judge*.

Petition for review of the orders of the Surface Transportation Board ("STB"), served

February 1, 2008, September 26, 2008, and October 16, 2009, finding a truck and rail transload

facility built and operated by an entity that was not a railroad did not fall within the STB's

_____

[1] The Honorable Mark R. Kravitz, United States District Court for the District of
Connecticut, sitting by designation.

1

exclusive jurisdiction, and thus failed to qualify for federal preemption from local zoning

regulations pursuant to the Interstate Commerce Commission Termination Act of 1995.

Petition denied.

_____

RONALD A. LANE, (Thomas J. Litwiler, *on the brief)* Fletcher & Sippel, LLC, Chicago, Illinois, *for Petitioner New York & Atlantic Railway Company.*

JOHN F. McHUGH, New York, New York, *for Petitioner Coastal Distribution, LLC*.

VIRGINIA STRASSER, Surface Transportation Board, Washington D.C. (Ellen D. Hanson, General Counsel, Evelyn G. Kitay, Associate General Counsel, *on the brief*; Philip J. Weiser, Deputy Assistant Attorney General, Robert B. Nicholson, John P. Fonte, Attorneys, Department of Justice, Washington, D.C., *on the brief*) *for Respondents Surface Transportation Board and the United States of America.*

HOWARD M. MILLER, Bond, Schoeneck & King PLLC, Garden City, New York, *for Intervenor Town of Babylon*;

FRAN M. JACOBS, Duane Morris LLP, New York, New York, *for Intervenor Pinelawn Cemetery*.

POOLER, *Circuit Judge*:

This case delineates the power of the Surface Transportation Board ("STB") to decide

what the extent to which the construction and operation of transloading[2] facilities fall within the

STB's exclusive jurisdiction, freeing the operations from local regulation by way of federal

preemption. Petitioners New York & Atlantic Railway Company ("NYAR") and Coastal

Distribution, LLC ("Coastal") appeal from the February 1, 2008, September 26, 2008, and

_____

[2] Transloading is the practice of transferring a shipment from one mode of transportation to another, i.e. from trucks to rail cars.

2

October 16, 2009 orders of the STB finding that a transload facility operated by Coastal in NYAR's Farmingdale Yard in the town of Babylon does not fall within the STB's exclusive jurisdiction. Petitioners argue that the transload facility is an integral part of the NYAR's railroad operations, and thus entitled to federal preemption. As we find the decisions by the STB were neither arbitrary nor capricious, we deny the petition.

## BACKGROUND

NYAR is a short-line railroad, formed to run the freight operation of the Long Island Rail Road ("LIRR") after the LIRR became exclusively a passenger operation. The freight franchise agreement includes the right to use the LIRR's Farmingdale Yard, located within the town of Babylon. The Farmingdale Yard is located on two parcels leased by LIRR from Pinelawn Cemetery. The leases, entered into in 1904 and 1905, permit the LIRR to lease the parcels for an initial term of 99 years, with the right to renew for another 99 years. In a separate state court action, Pinelawn is seeking to evict NYAR and Coastal from the Farmingdale Yard on the grounds of abandonment. *Pinelawn Cemetery v. Coastal Distribution, LLC*, 906 N.Y.S.2d 565 (2d Dept. 2010). The Second Department stayed that action to permit Pinelawn to seek a certificate of adverse abandonment from the STB, which would allow Pinelawn to seek to evict the railroad. *Id.* at 941.

In 2002, Coastal and NYAR entered into an agreement to refurbish the Farmingdale Yard to primarily handle the transloading of construction materials, mainly building materials and construction and demolition debris (the "Facility"). In return for building a structure suited to that task, Coastal would be granted the exclusive right to conduct transloading operations at the Farmingdale Yard by NYAR. It is undisputed that Babylon's zoning ordinance forbids the operation of a waste transfer facility anywhere in the Town except for an area remote from the

3

Facility and inaccessible by rail.

On March 29, 2004, as work on the new transload facility neared completion, a Babylon building inspector served Coastal with a stop work order stating that the transload facility violated the Town's zoning ordinance. Coastal appealed to the Town's Zoning Appeals Board, which upheld the stop work order in 2005, finding the facility constituted an impermissible use.

On April 26, 2005, NYAR and Coastal filed suit in the Eastern District of New York seeking to enjoin Babylon's enforcement efforts on the grounds that Babylon's zoning ordinance was preempted under the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). *Coastal Distribution, LLC v. Town of Babylon*, No. 05 Civ. 2032, 2006 WL 270252 (E.D.N.Y. Jan. 31, 2006). The district court granted Coastal a preliminary injunction barring enforcement action by Babylon, on the grounds that Coastal demonstrated a likelihood of success in showing the transload facility came within the STB's exclusive jurisdiction. *Id.* at *4- 10. This Court upheld the injunction, finding no clear error, but modified the injunction to permit the parties to bring the matter to the STB for a determination of whether the transload facility did, in fact, fall within the STB's exclusive jurisdiction. *Coastal Distribution*, *LLC v. Town of Babylon*, 216 Fed. Appx. 97, 103 (2d Cir. 2007).

Babylon and Pinelawn Cemetery petitioned the STB for a declaratory order that the Town's zoning ordinance was not preempted. In February, 2008, the STB granted the petition, finding the Farmingdale transload facility was not within the scope of its jurisdiction. *Pinelawn Cemetery*, STB Finance No. 35057, 2008 WL 275697 (STB served Feb. 1, 2008) ("*Babylon I*") The STB found that its exclusive jurisdiction "extends to the rail-related activities that take place at transloading facilities if the activities are performed by a rail carrier or the rail carrier holds out its own service through the third-party as an agent or exerts control over the third-

4

party's operation." *Id.* at *3.

The STB concluded that "the facts of this case fail to establish that Coastal's activities are being offered by NYAR or through Coastal as NYAR's agent or contract operator." *Id.* at *4. The STB found that when read in its entirety, the Operations Agreement between Coastal and NYAR reveals that NYAR is not involved in the facility, such that "[u]nder the parties' agreement, NYAR's responsibility and liability for the cars end when they are uncoupled at the Farmingdale Yard and resumes when they are coupled to NYAR's locomotive." *Id.* (footnote omitted). The STB determined that Coastal exercised almost total control over the facility, including the exclusive right to conduct transloading operations; is solely responsible for constructing and maintaining the facility, including track repairs; and provides and maintains all rail cars. *Id.* The STB also found that the pricing and payment structure demonstrated a lack of control by NYAR, as Coastal charged a loading fee for its transloading services, over which the NYAR exercised no control, and that Coastal conducted all its own customer negotiations, paid its own bills, collected its loading fee separately from customers and could enter into separate agreements in its own name. *Id.*

Coastal and NYAR moved for reconsideration. *Pinelawn Cemetery*, STB Finance 35057, 2008 WL 4377804, (STB served Sept. 26, 2008) ("*Babylon II*"). In moving for reconsideration, Coastal and NYAR relied heavily on what they deemed "new evidence" -- a veto statement by then-Governor Eliot Spitzer expressing a preference for federal jurisdiction because absent preemption, the rail facility would close, forcing more traffic onto local roads. *Id.* at *3. The STB found this did not constitute new evidence, as it was available to Coastal and NYAR when *Babylon I* was under consideration. *Id.* at *3-4. Petitioners also urged the STB to find it could exercise exclusive jurisdiction over a rail facility, regardless of ownership. The STB declined to

5

review its earlier ruling. *Id.* at *5.

On October 10, 2008 -- a few weeks after *Babylon II* was served on the parties  - Babylon and Pinelawn returned to the district court and sought to vacate the preliminary injunction.  In opposing that motion, NYAR and Coastal represented to the district court that the two had entered into an amended agreement (the "Amended Agreement") that placed them into a principal-agency relationship.  NYAR and Coastal also argued that the newly passed Clean Railroads Act of 2008 ("CRA"), 49 U.S.C. §§ 10909, preempted Bablyon's zoning ordinances. The CRA requires that solid waste rail transfer facilities follow the same state and federal laws and regulations that apply to non-railroads, except that land use regulations may not be applied to existing facilities.

Babylon and Pinelawn petitioned the STB for the third time, asking that it issue a declaratory order holding that the decisions in *Babylon I* and *Babylon II* remained valid following the Amended Agreement and the passage of the CRA.  *Pinelawn Cemetery*, STB Finance  373724, 2009 WL 3329242 (STB served October 16, 2009) ("*Babylon III*").  The STB determined that the Amended Agreement did not create a principal-agency relationship, because (1) NYAR continued to have only limited influence over transloading fees; (2) NYAR lacked control over the operation of the Facility; and (3) Coastal alone provided and billed for the transloading services.  *Id.* at *4-5. The STB also held that the CRA did not apply to the Facility because the Facility was not, "owned or operated by or on behalf of a rail carrier." *Id.* at *6 (internal quotation marks omitted).

NYAR and Coastal sought review of the STB's decisions in the United States Court of Appeals for the District of Columbia.  That court transferred the case to us, finding venue proper here as "[t]he underlying controversy . . . is subject to a preliminary injunction issued by the

6

Eastern District of New York and affirmed by the Second Circuit. Litigation in those courts is ongoing." *New York & Atl. Ry. Co. v. Surface Transp. Bd.*, 2010 U.S. App. LEXIS 6645, at *2 (D.C. Cir. Mar. 29, 2010) (citations omitted). This appeal followed.

## DISCUSSION

### I. Standard of Review.

It is well settled that "Congress has exercised broad regulatory authority over rail transportation." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009). Congress chose to vest the STB with exclusive jurisdiction over "transportation by rail carriers," and it is "uniquely qualified" to determine whether state law is preempted by Section 10501(b). *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 639 -43 (2d Cir. 2005)(internal quotation marks and citation omitted). The STB asks that we join the U.S. Court of Appeals for the District of Columbia in finding that its determinations regarding the scope of its exclusive jurisdiction are entitled to deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). *See, e.g., Bhd. of Locomotive Eng'rs v. United States*, 101 F.3d 718, 726 (D.C. Cir. 1994). We need not decide if the STB's determination here is entitled to *Chevron* deference, however, because we reach the same result applying the less deferential standard of review set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Wong v. Doar*, 571 F.3d 247, 259 (2009) (declining to determine whether an agency ruling is subject to *Chevron* or *Skidmore* deference when the agency's ruling withstands scrutiny under either standard).

As to the application of Section 10501 to the facts as determined by STB, the parties agree that under the Administrative Procedure Act, this Court cannot set aside the STB's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or "unsupported by substantial evidence." 5 U.S.C. §

7

706(2)(E); *see also N. Am. Freight Car Ass'n v. Surface Transp. Bd.*, 529 F.3d 1166, 1170-71 (D.C. Cir. 2008). An agency also acts in an arbitrary and capricious manner if the "agency departs from its own precedent without a reasoned explanation." *Borough of Columbia v. Surface Transp. Bd.*, 342 F.3d 222, 229 (3d Cir. 2003).

## II. The STB's jurisdiction pursuant to the ICCTA

The ICCTA grants the STB exclusive jurisdiction over "transportation by rail carriers." 49 U.S.C. § 10501(b)(1). "Transportation" includes a "yard, property [or] facility . . . of any kind related to the movement of [property] by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9)(A). Many courts, including ours, recognize that the ICCTA grants the STB "wide authority" over transloading facilities. *Green Mountain*, 404 F.3d at 642 (citing cases). The parties all agree that if the Facility were owned and operated by NYAR, a licensed rail carrier, the Facility would fall within the STB's jurisdiction and would be entitled to Section 10501(b) preemption. It is also undisputed that while NYAR is a licensed rail carrier, Coastal is not.

The issue before us, then, is whether the STB exercises exclusive jurisdiction over "the construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or side tracks, or facilities" under 49 U.S.C. § 10501(b)(2) even when such facilities are not operated by, or under the control of, a "rail carrier" as defined in Section 10501(b)(1). We begin our analysis by examining the language of the statute, which provides in relevant part:

> (a)(1) Subject to this chapter, the Board has jurisdiction over transportation that is --
>
> > (A) only by railroad; or
> >
> > (B) by railroad and water, when the transportation is under common

8

control, management, or arrangement for a continuous carriage or shipment;

* * *

(b) The jurisdiction of the Board over --

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

(c)(1) In this subsection --

* * *

(2) Except as provided in paragraph (3), the Board does not have jurisdiction under this part over --

(A) mass transportation provided by a local government authority; or

(B) a solid waste transfer facility . . . .

49 U.S.C. § 10501.

Here, the STB reasoned that before it can exercise exclusive jurisdiction under Section 10501(b)(2), "an activity must constitute 'transportation' and must be performed by, or under the auspices of, a 'rail carrier'" as set forth in Section 10501(b)(1). *Babylon II*, 2008 WL 4377804, at *5 (citation omitted). Because it determined Coastal was not a rail carrier within the meaning of Section 10501(a), the STB concluded it need not consider Section 10501(b)(2). *Id.* NYAR argues that determination was error, because Section 10501(b)(2) constitutes an independent grant of jurisdiction triggering preemption, even if the activities in question are not performed

9

by or under the control of a rail carrier.

We agree with the STB's reading of the statute, which gives each section a clear purpose: Section (a) defines the scope of the STB's jurisdiction, providing the STB with jurisdiction over "transportation . . . by railroad": Section (b) explains when that jurisdiction is exclusive and preempts other law; and Section © carves out exceptions to the jurisdictional grant set forth in Section (a). As the STB points out, Section 10501(b)(2) covers ancillary activities, such as yard track, that were long exempt from preapproval licensing requirements by STB and its predecessor agency, the ICC. *See* 49 U.S.C. 10906 (STB does not have licensing "authority under this chapter over construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks"). Both the courts and the STB thus consistently find that to fall within the STB's exclusive jurisdiction, the facility or activity must satisfy both the "transportation" and "rail carrier" statutory requirements. *See, e.g., Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 307-10 (3d Cir. 2004).

In *Hi Tech*, the Canadian Pacific Railroad and Hi Tech entered into a license agreement, under which Hi Tech agreed to build a C&D bulk waste loading facility at the Oak Island Rail Yard ("OIRY"). *Id.* at 300. At Hi Tech's transload facility, trucks arrived with C&D waste, discharged the C&D waste into a Hi Tech hopper, and that waste was then loaded into rail cars from the hoppers. Canadian Pacific then transported the waste. *Id.* Hi Tech's agreement made it responsible for constructing and maintaining the facility, and Canadian Pacific disclaimed liability and responsibility for Hi Tech's operations. *Hi Tech Trans, LLC*, STB Finance 34192, 2003 WL 21952136 (STB 2003). As Petitioners do here, Hi Tech argued to the Third Circuit that "it is subject to the exclusive jurisdiction of the STB even though it is not certified as a 'railcarrier' because its facility falls under the ICCTA's definitions of 'transportation' and 'railroad.'" *Hi Tech*, 382 F.3d at 308.

10

The Third Circuit found:

> Even if we assume *arguendo* that Hi Tech's facility falls within the statutory definition of "transportation" and/or "railroad," the facility still satisfies only a part of the equation. The STB has exclusive jurisdiction over "*transportation* by rail carrier." However, the most cursory analysis of Hi Tech's operations reveals that its facility does not involve "transportation by rail carrier." The most it involves is transportation "*to* rail carrier." Trucks bring C & D debris from construction sites to Hi Tech's facility where the debris is dumped into Hi Tech's hoppers. Hi Tech then "transloads," the C & D debris from its hoppers into rail cars owned and operated by CPR, the railroad. It is CPR that then *transports* the C & D debris "by rail" to out of state disposal facilities.

*Hi Tech*, 382 F.3d at 308 (internal citations omitted). While petitioners attack *Hi Tech* on a variety of fronts, the STB correctly points out that there is, indeed, a difference between transportation to a rail carrier and transportation by a rail carrier - one is an independent business providing a service to a rail carrier and its customers, the other a facility that the rail carrier controls and represents as integral part of its services.

As explained above, there is no question that the activity at issue here constitutes "transportation" within the meaning of the statute. The only argument is whether the activities were performed by or under the control of a rail carrier. To make that determination, the STB examined the record evidence before it, including the agreement between the parties. The STB found that its jurisdiction "extends to the rail-related activities that take place at transloading facilities if the activities are performed by a rail carrier or the rail carrier holds out its own service through the third-party as an agent or exerts control over the third-party's operations." *Babylon I*, 2008 WL 275697, at *3. It concluded that "the facts of this case fail to establish that Coastal's activities are being offered by the NYAR or through Coastal as NYAR's agent or operator." *Id.* at *4. This decision is neither arbitrary nor capricious.

11

To support its findings, the STB determined that (1) "[u]nder the parties' agreement, NYAR's responsibilities and liability for the cars end when they are uncoupled at the Farmingdale Yard and resumes when they are coupled to NYAR's locomotive"; (2) Coastal exercises almost total control over the facility, including the exclusive right to conduct transloading operations; is solely responsible for constructing and maintaining the facility, including track repairs; and provides and maintains all rail cars; (3) Coastal may charge a loading fee for its transloading services which is in addition to the rail transportation charge payable to NYAR, and over which NYAR exercises no control; (4) Coastal conducts all its own customer negotiations, pays its own bills, collects its loading fee separately from customers and may enter into separate agreements in its own name; and (5) Coastal maintains liability insurance in favor of NYAR and agreed to indemnify NYAR for all claims and liabilities arising out of Coastal's use of the premises. *Id.* at *4-5.

Based on these facts, the STB concluded that:

> Coastal is offering its own services to customers directly, and NYAR's involvement is essentially limited to transporting cars to and from the facility. Because Coastal is the only party that operates the transloading facility and is responsible for it, and because NYAR has assumed no liability or responsibility for Coastal's transloading activities, NYAR's level of involvement with Coastal's transloading operations at the Farmingdale Yard is insufficient to make Coastal's activities an integral part of NYAR's provision of transportation by "rail carrier." Thus, the Board does not have jurisdiction over Coastal's activities, and Federal preemption in section 1051(b) does not apply.

*Id.* at *4 (footnote omitted).

The STB determined the Amended Agreement also failed to demonstrate NYAR exercised sufficient control over the Facility to bring it within the STB's jurisdiction. Specifically, the STB determined that (1) Coastal continues to be solely responsible for marketing its transload service; (2) Coastal retained the transload fee, paying rent to NYAR in

12

the form of a usage fee; and (3) NYAR pays Coastal nothing. *Babylon III*, 2009 WL 3329242, at *4.

Moreover, the STB's analysis in *Babylon I*, *Babylon II* and *Babylon III* is consistent with other STB decisions involving the intersection of railroads and transload facilities. For example, in *Hi Tech*, the STB examined whether a railroad exercised sufficient control over a transload operation to bring it within the STB's jurisdiction. 2003 WL 21952136, *1-2. As it did here, the STB found, "[t]here is no dispute that Hi Tech's transloading activities are within the broad definition of transportation." *Id.* at *4. And also as it did here, the STB continued its analysis, holding that "[t]his is only part of the statutory equation, however. To be preempted, the transportation activities must be performed by a rail carrier." *Id.* The STB rejected Hi Tech's argument that the transload facility is an integral part of the interstate rail system because the debris being transported cannot be transported by rail without first being loaded into rail cars. *Id.* Noting that Hi Tech "essentially . . . maintains that there is no legal distinction between a transloading facility operated by a noncarrier licensee and one operated by a rail carrier," the STB held:

> By Hi Tech's reasoning, any third party or noncarrier that even remotely supports or uses rail carriers would come within the statutory meaning of transportation by rail carrier. The Board and its predecessor, the Interstate Commerce Commission, have indicated that the jurisdiction of this agency may extend to certain activities and facets of rail transloading facilities, but that any such activities or facilities must be closely related to providing direct rail service. In every case, jurisdiction was found and local regulations relating to transportation facilities preempted only when those facilities have been operated or controlled by a rail carrier. Here, Hi Tech's activities are not performed by a rail carrier.

*Id.* (internal citations omitted). In so holding, the STB relied on facts similar to those presented here:

13

> The facts of this case establish that Hi Tech's relationship with CP is that of a shipper with a carrier. Hi Tech brings cargo and loads it onto rail cars, and CP, under the Transportation Agreement, hauls it to a destination designated by Hi Tech. In fact, CP describes Hi Tech as its largest shipper at the Oak Island Yard, and Hi Tech boasts the same. Moreover, CP disclaims any agency or employment relationship with Hi Tech and, under the License Agreement, the parties all but eliminate CP's involvement in the operation of the transloading facility and its responsibility for it. There is no evidence that CP quotes rates or charges compensation for use of Hi Tech's transloading facility. Thus, CP's level of involvement with Hi Tech's transloading operation at its Oak Island Yard is minimal and insufficient to make Hi Tech's activities an integral part of CP's provision of transportation by rail carrier.

*Id.* (footnote omitted). The Third Circuit agreed, holding that using rail cars to transport debris "does not morph Hi Tech's activities into 'transportation by rail carrier.'" *Hi Tech*, 382 F.3d at 309.

Moreover, other STB decisions demonstrate that where the railroad maintains the appropriate control over the transload facility, the STB exercises its exclusive jurisdiction and federal preemption applies. *See City of Alexandria, Virginia*, STB Finance 35157, 2009 STB LEXIS 3 (STB served Feb. 17, 2009). There, the STB exercised jurisdiction where (1) the railroad owned the transload facility and built it with its own funds; (2) the railroad paid the transload operator a fee, rather than the operator paying the railroad a fee; (3) the railroad held itself out as offering the transload services as part of its common carrier service; and (4) the transload operator had no role in setting, invoicing or collecting the transload fee. *Id.* at *7-12; *see also Borough of Riverdale*, Docket 35299, 2010 WL 3053100 (STB served Aug. 5, 2010) (transloading operation qualifies for federal preemption where railroad responsible for making improvements to the facility, railroad determines the rates and railroad controls operating procedures at facility).

14

Finally, the STB properly determined that the Facility is not covered by the CRA. The CRA removes "solid waste transfer facilities" from the STB's jurisdiction, except in certain enumerated cases detailed in 49 U.S.C. § 10908(b). The exemptions apply only to facilities that fall under the STB's jurisdiction. 49 U.S.C. § 10908(a). As we agree with the STB's conclusion that the Facility "is not (and never was) part of 'transportation by rail carrier' within the Board's jurisdiction," *Babylon III*, 2009 WL 3329242, at *6, the Facility is not exempt from the CRA.

## CONCLUSION

We have considered the remainder of petitioners' arguments and find them without merit. For the reasons given above, the petition is denied.