**CITY OF GIRARD, Appellant,**

v.

**YOUNGSTOWN BELT RAILWAY COMPANY et al., Appellees.**

[Cite as *Girard v. Youngstown Belt Ry. Co.*, 196 Ohio App.3d 271, 2011-Ohio-4699.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2010–T–0079.

Decided Sept. 16, 2011.

272

Frank R. Bodor;  and Mark M. Standohar, Girard Law Director, for appellant.

Manchester, Bennett, Powers & Ullman, L.P.A., C. Scott Lanz, and Thomas J. Lipka, for appellees Youngstown Belt Railway Company, Consolidated Rail Corporation, and Erie Land and Improvement Company of Pennsylvania.

Dennis Watkins, Trumbull County Prosecuting Attorney, for appellees Trumbull County Auditor and Trumbull County Treasurer.

---

CYNTHIA WESTCOTT RICE, Judge.

{¶ 1} Appellant, the city of Girard, appeals from the judgment of the Trumbull County Court of Common Pleas granting the motion of Youngstown Belt Railway Company et al. ("YBR"), appellees, for summary judgment based upon YBR's assertion that the trial court lacked jurisdiction to consider Girard's appropriation complaint because the action was preempted by federal law. At issue is whether the trial court erred in finding that Girard's appropriation action was preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), Section 10101 et seq., Title 49, U.S.Code. For the reasons discussed herein, we affirm the judgment of the trial court.

## Statement of Facts and Procedural Posture

{¶ 2} On November 15, 2006, Girard filed an action to appropriate approximately 41.5 acres of vacant land, referred to as Mosier Yard, located in the city of Girard and owned by appellee Youngstown Belt Railway. Girard sought to acquire the land to create public recreational and park grounds. The crescent-shaped parcel has rail lines on its outermost east and west sides, with the Mahoning River running along the west side of the western tracks and an abandoned railway situated between these western tracks and Mosier Yard. In preparing the legal description of the parcel, Girard excluded a 100–foot–wide right-of-way on the eastern side of the existing tracks. Although YBR uses "three or four acres" of the roughly 55–acre property for storage of railroad equipment and materials, the portion of the property Girard sought to appropriate appeared, at the time the complaint was filed, to be generally unused.

{¶ 3} YBR filed its answer and, in defense of the action, asserted the proceedings were preempted by the ICCTA. Total Waste Logistics of Girard, L.L.C. ("TWL") subsequently intervened in the case alleging an interest in the underlying complaint. TWL asserted it had entered into a purchase agreement for the land in question for $275,000. The record indicates that TWL wished to obtain the property to create a landfill for construction and demolition debris. At the time of the suit, TWL had applied for, but had not received, the necessary permits to use the land as a disposal site. Once it obtained the required permits, Guy Fragle, TWL's director of operations, averred that TWL would grant YBR easements on the property to install additional rail so YBR could transport debris

to designated sites in the landfill. According to William Strawn, YBR's president, the purchase by TWL was still pending at the time that the suit was initiated and, because the permits were still pending, he could not comment on when or if the agreement would be finalized.

{¶ 4} In April 2008, YBR filed a motion for summary judgment asserting that Girard's appropriation was expressly preempted by the ICCTA and thus the trial court lacked jurisdiction to hear the case. YBR pointed out that the ICCTA creates exclusive federal regulatory jurisdiction over railroads and exclusive federal remedies. To the extent a state-law cause of action would unreasonably interfere with a rail carrier's transportation of persons or property, it is preempted by the ICCTA, and the Surface Transportation Board ("STB") is the exclusive body charged with adjudicating the matter. According to YBR, Girard's appropriation would preclude its current and future plans for rail transportation, and therefore the taking would unreasonably interfere with railroad transportation in violation of the ICCTA.

{¶ 5} In response, Girard moved to dismiss YBR's motion for summary judgment, asserting that the Ohio Rules of Civil Procedure are inapplicable to appropriation proceedings pursuant to Civ.R. 1(C). YBR filed a memorandum in opposition to Girard's motion to dismiss asserting that its motion for summary judgment functioned to challenge the court's jurisdiction and was therefore not "clearly inapplicable" under the circumstances. On June 26, 2008, the trial court overruled Girard's motion to dismiss.

{¶ 6} Girard subsequently filed a memorandum in opposition to YBR's motion for summary judgment as well as a motion for summary judgment of its own. In its motion, Girard argued that the subject land does not encroach upon or interfere with any existing or abandoned lines and thus could not unreasonably interfere with railroad operations. Girard further observed that YBR's pending sale of the land to TWL for use as a dump site underscored this point. Because the appropriation will have no effect on railroad transportation, Girard asserted that the matter was not preempted and the Trumbull County Court of Common Pleas had jurisdiction to resolve the matter.

{¶ 7} On May 15, 2010, after several status conferences on the issues, the trial court issued an entry on the pending motions. The court set forth the general background of the case and provided a brief summary of each party's position. The court then issued a ruling, indicating that "it may be without jurisdiction to enter a final judgment in this matter." Given this uncertainty, the trial court ordered "the parties to apply to the STB for a determination as to whether it chooses to exercise its right of preemption." The trial court stayed the matter on its inactive docket until the jurisdictional issue was resolved.

{¶ 8} Girard filed a notice of appeal from the trial court's entry, after which YBR filed a motion to dismiss for want of a final, appealable order. Girard filed a memorandum in opposition to YBR's motion to which YBR subsequently replied. This court held the motion in abeyance "until such time the appeal is reviewed on the merits." A briefing schedule was set and the parties filed their respective briefs.

{¶ 9} On April 19, 2011, this court issued a judgment ruling that the trial court's decision was not a final, appealable order. In light of this conclusion, this court remanded the matter to the trial court to enter a final judgment on the matter. On April 26, 2011, the trial court entered a final judgment ruling Girard's appropriation action was both expressly and impliedly preempted by the ICCTA. As the trial court's order did not affect the issues addressed in the parties' previously filed briefs, this court treated Girard's original notice of appeal as premature and allowed the matter to go forward.

{¶ 10} Girard asserts two assignments of error. As Girard's assigned errors are related, we shall address them together. Girard respectively asserts:

{¶ 11} "[1] The trial court committed prejudicial error and abused its discretion in finding upon remand under the facts of this case that the ICCTA acts to preempt Ohio's appropriation statute thereby committing jurisdiction to the Surface Transportation Board.

{¶ 12} "[2] The trial court committed prejudicial error and abused its discretion in 1) failing to apply a presumption in favor of Girard required by law; and 2) in overruling Girard's motion for summary judgment and sustaining Youngstown Belt Railway Company's motion for summary judgment."

{¶ 13} On appeal, Girard argues that the ICCTA does not preempt the underlying appropriation proceeding and therefore the trial court's decision is contrary to law. Girard argues that its appropriation action should be allowed to proceed in state court because the property in question does not interfere with any existing or abandoned rail lines and thus does not affect rail transportation or the movement of passengers or property. Girard points out that aerial photos of the parcel from the years 1999, 2000, 2005, and 2006 demonstrate that the 41.5 acres at issue have not been "utilized for any purpose except paths created by all terrain vehicles." And, in any event, Girard emphasizes that its appropriation will include only 41.5 of the 55 contiguous acres owned by YBR, thereby leaving YBR with 13 remaining acres, plus a 100 foot right-of-way, to store and stage its materials and equipment.

{¶ 14} Girard additionally emphasizes that YBR's pending sale of the entire 55–acre parcel is prima facie evidence that YBR does not need the property for rail transportation. And furthermore, YBR's purported intent to use the proper-

ty, sale or no sale, for rail operations is unsupported by any specific plans. In essence, Girard argues that YBR's claim for future rail use is merely a stratagem used to block Girard from acquiring the land for its stated purposes. Because the appropriation would not have the effect of regulating or burdening rail transportation, Girard maintains that the state court has jurisdiction to consider the matter.

{¶ 15} In response, YBR contends that the trial court did not err in ruling that the matter was preempted because, contrary to Girard's position, the appropriation would unreasonably interfere with its current and future plans for its rail operations. According to YBR, it uses three to four random acres of the subject property annually for staging and storage of railroad materials and equipment. Further, according to YBR representatives, the sale of the land to TWL would cause YBR to construct additional track onto the property so rail cars could then transport construction debris to the landfill. These activities would generate significant revenue for YBR, allowing it to reinvest in its infrastructure to increase its rail operations in the area.

{¶ 16} Moreover, even if TWL is unable to obtain the necessary permits to create the landfill and the sale does not go through, YBR claims that it still plans to use the vacant property to expand its current rail operations by installing additional rails. YBR, through its representatives, argues that such lines will be necessary to accommodate the foreseeable increase in railway traffic in the region of Mosier Yard. Because YBR has specific plans for the property, either of which would directly involve railway transportation, it maintains that Girard's appropriation action has the effect of regulating railroad operations and unreasonably interfering with railroad transportation. Pursuant to the ICCTA, YBR therefore asserts that the matter is preempted and falls within the exclusive jurisdiction of the federal STB, the agency charged with ruling on causes governed by the ICCTA.

## Standard of Review

{¶ 17} Initially, we recognize that the underlying judgment on appeal awarded YBR summary judgment. Because the arguments at issue are jurisdictional in nature, premised upon the applicability of federal preemption, we shall treat the trial court's judgment as a dismissal entered pursuant to Civ.R. 41(B)(4)(a). That rule permits a court to dismiss a cause, "otherwise than on the merits," for lack of jurisdiction over the subject matter. As the sole issue currently before this court is the preemptive effect of the ICCTA, we review the court's decision de novo. See *Friberg v. Kansas City S. Ry. Co.* (C.A.5, 2001), 267 F.3d 439, 442 (the preemptive effect of a federal statute is a question of law reviewed de novo).

## Discussion and Analysis

{¶ 18} In its brief, Girard initially underscores what it considers a "confusion" in the trial court's judgment entry. To wit, Girard queries: if the STB has jurisdiction over the underlying dispute, "then what gives the trial court the power to assume authority to rule on the preemption matters?" Although Girard formulates its position in the form of a question, it is obviously challenging the trial court's power to rule on the preliminary issue of jurisdiction. Girard's challenge is not well taken.

{¶ 19} A court possesses the authority to determine whether, as a matter of law, it has subject-matter jurisdiction over a particular case or controversy. *Swift v. Gray*, 11th Dist. No. 2007–T–0096, 2008-Ohio-2321, 2008 WL 2045018, at ¶ 38 ("The existence of the court's own subject-matter jurisdiction in a particular case poses a question of law which the court has the authority and responsibility to determine"). See also *Internatl. Language Bank, Inc. v. Ryan*, 11th Dist. No. 2010–A–0018, 2010-Ohio-6060, 2010 WL 5111174, at ¶ 28. Moreover, a general review of the cases relating to the ICCTA demonstrates that trial courts, both federal district courts and state courts of common pleas, routinely consider whether state causes of action are preempted by the statute and thereby committed to the STB's jurisdiction. Thus, the trial court's legal conclusion that the cause of action was within the jurisdiction of the STB, pursuant to the ICCTA, raises no jurisdictional red flags. With this in mind, we shall begin our analysis of Girard's arguments with a brief overview of the doctrine of preemption.

## Preemption in General

{¶ 20} The doctrine of preemption is rooted in the Supremacy Clause of Article VI of the United States Constitution and stands for the general proposition that courts implement Congress's intent for a federal law to trump, and consequently supersede, the enforceability of a state law. *Fid. Fed. S. & L. Assn. v. de la Cuesta* (1982), 458 U.S. 141, 152–153, 102 S.Ct. 3014, 73 L.Ed.2d 664. In any case requiring a determination whether a state-law cause of action is preempted by a federal statute, "the purpose of Congress is the ultimate touch-stone." *Retail Clerks v. Schermerhorn* (1963), 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179. Congress may show its preemptive purpose in one of two ways. *Altria Group, Inc. v. Good* (2008), 555 U.S. 70, 129 S.Ct. 538, 543, 172 L.Ed.2d 398. First, Congress may set forth its preemptive intent through the express language of a statute. Id. Even when there is an express preemption clause in a federal act, however, questions may still arise regarding "the substance and scope of Congress' displacement of state law." Id. Second, Congress may impliedly preempt state law "if the scope of the [federal] statute indicates that Congress intended

federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." Id.

{¶ 21} The Supreme Court of the United States has applied a presumption *against* preemption when the state legislation at issue relates to the "historic police powers of the States." *Altria Group, Inc.* The Fifth Circuit Court of Appeals has explained that this presumption is applicable to "areas of law traditionally reserved to the states, like police powers and property law." *Davis v. Davis* (C.A.5, 1999), 170 F.3d 475. An appropriation action does not fall under the rubric of a state's police powers. See, e.g., *Kelo v. New London* (2005), 545 U.S. 469, 520, 125 S.Ct. 2655, 162 L.Ed.2d 439 ("The question whether the State can take property using the power of eminent domain is therefore distinct from the question whether it can regulate property pursuant to the police power"). Moreover, we have found no case specifically holding that a state government's constitutional power of eminent domain has been considered a matter of state property law. Nevertheless, in Ohio, state and local governments have traditionally possessed the power to take privately owned property, for reasonable compensation, by filing an action in appropriation. We shall therefore consider the trial court's judgment presuming ICCTA does not preempt the underlying appropriation action.

### Express Preemption

{¶ 22} "Congress and the courts long have recognized a need to regulate railroad operations at the federal level," and Congress's power to do so under the Commerce Clause is well established. *Auburn v. United States Government* (C.A.9, 1998), 154 F.3d 1025, 1029. Thus, "[i]n enacting the ICCTA, Congress sought to deregulate * * * [and] to federalize many aspects of railway regulation that previously had been reserved for the states in an effort to * * * revitalize the [surface transportation] industry." *Cedarapids, Inc. v. Chicago, Cent. & Pacific RR. Co.* (N.D.Iowa 2003), 265 F.Supp.2d 1005, 1011. To ensure the deregulation and federalization of the rail industry, the ICCTA grants exclusive jurisdiction of matters relating to rail-carrier-transportation regulation to the STB. The section of ICCTA conferring jurisdiction to the STB also sets forth an express preemption clause, which provides:

{¶ 23} "The jurisdiction of the [STB] over—

{¶ 24} "(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

{¶ 25} "(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the

280

tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." Section 10501(b), Title 49, U.S.Code.

{¶ 26} A complete reading of Section 10501(b) demonstrates that the express preemptive authority of the ICCTA is located in the last sentence under Section 10501(b)(2), Title 49, U.S.Code: If an activity attempts to regulate rail transportation by rail carriers, the remedies set forth in the ICCTA are "exclusive *and preempt the remedies provided under Federal or State law.*" (Emphasis added.) See also *Franks Invest. Co., L.L.C. v. Union Pacific RR. Co.* (C.A.5, 2010), 593 F.3d 404, 410; *Florida E. Coast Ry. Co. v. W. Palm Beach* (C.A.11, 2001), 266 F.3d 1324, 1331.

■ {¶ 27} In construing the preemptive scope of Section 10501(b)(2), various federal courts of appeals have held that the ICCTA acts to preempt or displace *only* "regulation"; i.e., " 'all "state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." ' " *Adrian & Blissfield RR. Co. v. Blissfield* (C.A.6, 2008), 550 F.3d 533, 539, quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson* (C.A.3, 2007), 500 F.3d 238, 252, quoting *Florida E. Coast Ry. Co.* at 1331. Accord *Franks Invest. Co., L.L.C.*; see also *PCS Phosphate Co. v. Norfolk S. Corp.* (C.A.4, 2009), 559 F.3d 212, 218. Hence, to come within the STB's jurisdiction and consequently fall within preemption under Section 10501(b), Title 49, U.S.Code, activities must constitute the regulation of transportation and must be performed by, or under the auspices of, a rail carrier. *New England Transrail L.L.C.* (June 29, 2007), STB Finance Docket No. 34797, 2007 WL 1989841. It is undisputed that YBR is a rail carrier. At issue in this appeal is whether the evidence in the record demonstrates Girard's planned activities attempt to regulate transportation.

{¶ 28} The ICCTA expansively defines "transportation" to include:

{¶ 29} "(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

{¶ 30} "(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." Section 10102(9), Title 49, U.S.Code.

{¶ 31} Even though the ICCTA denotes the types of activities that fall within the gamut of "transportation," "[f]or a state court action to be expressly preempted under the ICCTA, it must seek to regulate the operations of rail transportation." *Franks Invest. Co.*, 593 F.3d at 413. The issue whether an activity or activities constitute transportation or are integrally related to transportation under the ICCTA is "a fact-specific determination." *New England Transrail, L.L.C.*

{¶ 32} With this in mind, the STB has underscored "two broad categories of state and local actions [that have been found] to be preempted regardless of the context or rationale for the action." *CSX Transp., Inc.* (May 3, 2005), STB Finance Docket No. 34662, 2005 WL 1024490. The Fifth Circuit Court of Appeals has explained the first category as follows:

{¶ 33} "First, there are those state actions that are 'categorically preempted' by the ICCTA because such actions 'would directly conflict with exclusive federal regulation of railroads.' * * * Regulations falling within this first category are 'facially preempted' or 'categorically preempted' and come in two types:

{¶ 34} "The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized * * *.

{¶ 35} "Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines * * *; railroad mergers, line acquisitions, and other forms of consolidation * * *; and railroad rates and service." *New Orleans & Gulf Coast Ry. Co. v. Barrois* (C.A.5, 2008), 533 F.3d 321, 332.

{¶ 36} Such regulations are per se preempted because, by their very nature, they unreasonably interfere with interstate commerce and must be preempted. Id.; see also *Adrian & Blissfield RR. Co.*, 550 F.3d at 540. We must therefore determine whether Ohio's appropriation statute falls within either of the foregoing categories such that it is categorically preempted. We hold it is not.

{¶ 37} We initially note that contrary to certain representations made by YBR in its brief, the use of a municipality's eminent-domain power is not subject to per se preemption under the ICCTA. See, e.g., *Dist. of Columbia v. 109,205.5 Square Feet of Land* (Apr. 25, 2005), D.D.C. No. 05–202, 2005 WL 975745; see also *South Dakota v. Burlington N. & Santa Fe RR. Co.* (D.S.D.2003), 280 F.Supp.2d 919, 931; *Florida E. Coast RR. Co.*, 266 F.3d at 1330–1331. Notwithstanding the broad preemption clause under Section 10501(b), Title 49, U.S.Code, the STB has specifically determined that state condemnation proceedings are not subject to "blanket" preemption by the ICCTA:

{¶ 38} "[N]either the court cases nor Board precedent, suggest a blanket rule that any condemnation action against railroad property is impermissible. Rather, routine, non-conflicting uses * * * are not preempted so long as they would not impede rail operations or pose undue safety risks." *Lincoln Lumber Co.–Petition for Declaratory Order–Condemnation of RR. Right–of–Way for a Storm Sewer* (Aug. 10, 2007), STB Finance Docket No. 34915, 2007 WL 2299735.

{¶ 39} Clearly, an appropriation or condemnation action will not always deny a rail carrier the ability to conduct its operations nor will it, in all cases, directly regulate matters committed to the STB. We recognize that courts have ruled condemnation actions that seek to appropriate actual railway or a railroad right-of-way are per se preempted by the ICCTA. See *Lincoln v. Surface Transp. Bd.* (C.A.8, 2005), 414 F.3d 858; see also *Union Pacific RR. Co. v. Chicago Transit Auth.* (Feb. 23, 2009), N.D. Ill. No. 07–CV–229, 2009 WL 448897. Such cases, however, presented scenarios in which the state condemnation action fundamentally interfered with or impeded railroad operations. This case does not present such facts.

{¶ 40} The property under consideration, while owned by YBR, does not touch upon any currently operational or abandoned rails. And Girard does not seek to take the entire property. It proposes to appropriate 41.5 of approximately 55 acres and also reserve a 100–foot right-of-way adjacent to the active rails. Finally, we underscore the appropriation proceeding at issue sought to acquire ostensibly unused railroad property to expand public recreational grounds, not to manage or govern YBR's operations or railroad transportation.

{¶ 41} We acknowledge that Girard's appropriation of 41.5 acres of Mosier Yard would have an effect on railroad transportation because it represents an acquisition of railroad property used currently by a rail carrier for staging and storage. The allowances in Girard's proposal, however, demonstrate that the effects of the taking would be, at least in the immediate future, "remote" and "incidental" to railroad transportation. Consequently, the appropriation proceeding would not function to regulate railroad transportation. See *Adrian & Blissfield RR. Co.*, 550 F.3d 533; *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d 238; *Florida E. Coast Ry. Co.*, 266 F.3d 1324; *Franks Invest. Co., L.L.C.*, 593 F.3d 404; *PCS Phosphate Co.*, 559 F.3d 212. Under the circumstances, we therefore hold that Girard's appropriation proceeding is not categorically or expressly preempted by the federal statute.

### Implied Preemption

{¶ 42} If a state law cause of action is not expressly preempted by the ICCTA, it still may be impliedly preempted or, alternatively, preempted "as applied." See, e.g., *Adrian & Blissfield RR. Co.* at 540. Such an analysis

requires a factual determination whether the cause would have " 'the effect of preventing or unreasonably interfering with railroad transportation.' " *New Orleans & Gulf Coast Ry. Co.*, 533 F.3d at 332, quoting *CSX Transp., Inc.*, STB Finance Docket No. 34662.[1]

{¶ 43} As outlined above, YBR asserts that it uses three or four acres of the 55–acre plot for staging and storing of railroad materials and equipment. According to YBR, not only would Girard's appropriation of approximately 42 acres of the parcel prevent or interfere with this use, the appropriation would undermine its future established plans for the property. Such plans include its alleged intent to install tracks to assist in dumping construction debris if the property is ultimately sold to TWL or, if it is not sold, its intent to install additional tracks on the property to expand its current rail operations. To the extent the appropriation would not allow YBR to actualize these plans, YBR maintains it would interfere with rail transportation and have the effect of regulating the railroad.

{¶ 44} In considering whether Girard's proposed appropriation of the property would constitute a regulation that has the effect of preventing or unreasonably interfering with rail transportation, it is necessary to consider the facts relating to YBR's past and current activities on the affected property, in addition to its future plans for the property. If Girard's appropriation would unreasonably interfere with or impede YBR's operations in relation to railroad transportation, the presumption against preemption is rebutted and the matter must be committed to the STB.

{¶ 45} With respect to YBR's past and current use of the property, YBR's chief engineering officer, John Dulac, testified that the railroad used three or four acres of the property for staging and storing railroad property. He testified that this occurred annually from May to October, i.e., during YBR's construction season. There was some dispute regarding this particular use. Engineer J. Robert Lyden, retained by Girard, asserted that "[u]pon several physical inspections of the area that is contained within the 41.4993 acres being appropriated and an examination of aerial photos of the subject area taken in the years 1999, 2000, 2005 and 2006 there is no evidence that the area being taken by the City of Girard has been utilized for any purpose except paths created by all terrain vehicles." Despite Girard's reliance upon these points, we do not believe that

---

1. We recognize that the STB's decisions regarding the preemptive effect of the ICCTA and the test it uses for determining preemption are not binding upon a judicial tribunal. *Wyeth v. Levine* (2009), 555 U.S. 555, 129 S.Ct. 1187, 1201, 173 L.Ed.2d 51. Still, the "per se" and "as applied" analyses developed by the agency for analyzing preemption vis-à-vis the ICCTA has been adopted in its entirety by the Fifth and Sixth Circuit courts of appeal. See *Franks Invest. Co., L.L.C.,* and *Adrian & Blissfield RR. Co.* We defer to these federal appellate circuits on the value and guidance of the preemption tests crafted by the agency and thus adopt the same for purposes of this analysis.

Lyden's conclusions necessarily contradict Dulac's testimony. Simply because the photos indicate that the property, as a whole, appears unutilized on certain specific dates in four separate years does not imply it was not used for storage, etc., at other times of the year. We therefore agree with the trial court that Lyden's points "are not enough evidence [to refute YBR] when weighed in contrast with Dulac's testimony of precise instances of use."

{¶ 46} As already discussed, to the extent that the appropriation would include the three or four acres used for storage and the like, it would affect railroad transportation. An action that merely affects rail transportation, however, is insufficient to trigger preemption. See *Franks Invest. Co., L.L.C.*, 593 F.3d at 415. Instead, as discussed, for an action to be preempted "as applied," it must "have the effect of unreasonably burdening or interfering with rail transportation." *Id.* at 414. The issue therefore becomes whether YBR's future plans for the property *in conjunction with* its current usage of the property meets this test. We answer this question in the affirmative.

{¶ 47} The evidence indicated that TWL had entered a preliminary contract to purchase "approximately 55 acres" of YBR's property. If TWL obtained the necessary permits, the record indicates that it would put a landfill on the property purchased. Although Girard asserts that this purchase agreement included the entirety of the Mosier Yard property (which, in Girard's view, would preclude its use for rail transportation), William Strawn, YBR's president, testified that the 55–acre measurement was an estimation of the acreage that it would sell TWL, depending on each parties' relative business needs. Strawn elaborated:

{¶ 48} "We didn't ever say there was 55 acres. That's why it says 55 plus or minus with the intent being that if we only wanted to sell them 30 acres, that's all we had to sell. We knew we had track to put in there. We knew we had railroad growth coming, and so I just picked a number. I said 55 plus or minus. If we need more, you get less; if you need more, we get more in finances. * * * We don't have to sell them 55 acres. We can sell them 30. If that's not big enough for their blueprint because we need it for railroad, we need it for railroad. The deal's not been done."

{¶ 49} With respect to the sale, Strawn further explained that to the extent the sale is finalized and TWL creates a landfill, YBR would possess easements onto the property to construct the railway necessary to unload materials into the TWL facility. According to Strawn, the TWL landfill would require this railroad nexus because such a facility "couldn't go into business without the railroad." Guy Fragle, director of operations for TWL, confirmed much of Strawn's testimony in an affidavit. Fragle specifically averred that if TWL obtained a permit to construct a construction-and-demolition-debris landfill and the purchase of Mosier

Yard was finalized, TWL would grant YBR easements to construct additional track for YBR to transport materials by rail directly to disposal sites in the facility.

{¶ 50} To the extent that YBR's and TWL's plans come to fruition, YBR's participation in transporting the debris to the landfill would fall within the definition of rail transportation as defined by the ICCTA. The STB has specifically ruled that "intermodal transloading operations and activities involving loading and unloading materials from rail cars and temporary storage of materials are part of rail transportation that would come within the [STB's] jurisdiction." *New England Transrail, L.L.C.,* STB Finance Docket No. 34797, citing *Florida E. Coast Ry. v. W. Palm Beach,* 266 F.3d at 1327–1336.

{¶ 51} Strawn also discussed YBR's plans to make various "physical plant changes" that would incorporate the Mosier Yard property. He testified that the current rail system surrounding Mosier Yard is insufficient to handle the growing interstate railroad business and indicated that YBR specifically intended to develop the property as needed to accommodate this growth. Strawn testified that YBR is considering constructing an additional rail line running north and south on the affected property. Although Strawn did not testify when this development would occur and did not specify where on the parcel the expansion would occur, he testified that the 100–foot right-of-way offered by Girard would be inadequate for the railroad to meet its ultimate expansion goals.

{¶ 52} In addition to Strawn's points, Dulac testified to a current expansion in industries that use YBR's lines in the region. Because of this growth, Dulac asserted that even if the TWL transaction is never finalized, additional trackage will have to be placed on the Mosier Yard property. Dulac explained that the current track would be inadequate for the anticipated growth in use and as a result, such "capacity issues" will require YBR to use the Mosier Yard property. He testified that the property could be foreseeably used as a "holding area for trains because of the congestion, which would then mean that you would have to put in additional track otherwise you would have a bottle neck."

{¶ 53} We acknowledge that YBR's future plans for the property have not been fully established. Still, in *Lincoln,* 414 F.3d 858, the Eighth Circuit Court of Appeals determined that in the context of considering whether an eminent-domain action is preempted under the ICCTA, it is permissible to consider and evaluate a rail carrier's future plans as well as its current uses. *Lincoln* at 862. In support, the court reasoned that "[c]ondemnation is a permanent action, and 'it can never be stated with certainty at what time any particular part of a right of way may become necessary for railroad uses.'" Id., quoting *Midland Valley RR. Co. v. Jarvis* (C.A.8, 1928), 29 F.2d 539, 541. We consequently hold that there is sufficient testimony in the record from YBR's senior officials to warrant the

conclusion that the property will be used for rail transportation, as contemplated by the ICCTA, in the near future.

{¶ 54} Moreover, courts have acknowledged the ICCTA will preempt state law claims that stand to negatively impact the "economic realm" of railroads. *Friberg v. Kansas City S. Ry. Co.* (C.A.5, 2001), 267 F.3d 439, 443; see also *Fort Bend Cty. v. Burlington N. & Santa Fe Ry. Co.* (Tex.App.2007), 237 S.W.3d 355, 360; *Elam v. Kansas City S. Ry.* (2009), N.D. Miss. No. 1:09CV304–D–D, 2009 WL 774404. The testimony relating to YBR's future railroad expansion on the Mosier Yard property would have a foreseeable effect on interstate commerce and, by implication, would impact the so-called "economic realm" of railroad transportation.

## Conclusion

{¶ 55} Given the foregoing analysis, this court holds that Girard's action is impliedly preempted. YBR's current uses and future plans for the property indicate that Girard's appropriation, if granted, could have the ultimate effect of unreasonably interfering with rail transportation and those activities integrally related to transportation contrary to the jurisdictional provisions of Section 10501(b), Title 49, U.S.Code. We therefore hold that the state action is impliedly preempted by the ICCTA and the matter must be committed to the exclusive jurisdiction of the STB.[2] Although we conclude that the appropriation proceeding is preempted by the ICCTA, our holding is preliminary and should not be read to completely adjudicate or foreclose additional analysis by the STB on the issue. Our holding therefore functions to commit the matter to the STB for it to consider what remedy, if any, Girard may be entitled to.

{¶ 56} Girard's assignments of error are overruled, and the judgment entry of the Trumbull County Court of Common Pleas is hereby affirmed.

Judgment affirmed.

CANNON, P.J., concurs.

GRENDELL, J., dissents.

---

2. In its judgment entry, the trial court initially concluded that the current action is preempted per se because of its "aggressive regulatory nature." As discussed above, we do not believe that the underlying proceedings meet the test for express, per se preemption because Girard's proposed taking would not deny YBR the ability to conduct its operations and, even though it might affect rail transportation, the taking would not directly regulate matters committed to the STB. To this extent, we do not agree with the trial court's ruling. Because the trial court also determined the cause was preempted as applied, however, we affirm its ultimate conclusion.

DIANE V. GRENDELL, Judge, dissenting.

{¶ 57} I respectfully dissent from the majority's conclusion that Girard is impliedly preempted by the ICCTA from seeking relief in the trial court and that this matter is committed to the exclusive jurisdiction of the STB. This matter was not federally preempted and therefore the trial court properly had jurisdiction.

{¶ 58} State and local regulation of railroads is permissible when it does not interfere with interstate rail operations. *Dist. of Columbia v. 109,205.5 Square Feet of Land* (Apr. 25, 2005), D.D.C. No. 05-202, 2005 WL 975745; *Florida E. Coast Ry. Co. v. W. Palm Beach* (C.A.11, 2001), 266 F.3d 1324, 1330-1331. However, "state law actions can be preempted as applied if they have the effect of unreasonably burdening or interfering with rail transportation." *Franks Invest. Co., L.L.C. v. Union Pacific RR. Co.* (C.A.5, 2010), 593 F.3d 404, 414.

{¶ 59} It is appropriate for a trial court, and a reviewing appellate court, to make a determination whether an eminent-domain action "would interfere with rail operations and, therefore, whether removal based on complete preemption of the ICCTA [is] proper." *Bayou DeChene Reservoir Comm. v. Union Pacific RR. Corp.* (June 8, 2009) W.D.La. No. 09-0429, 2009 WL 1604658, *Sachse v. Kansas City S. Ry. Co.* (E.D.Tex.2008), 564 F.Supp.2d 649, 655-657 (an eminent-domain proceeding that had been removed from state court would not impede rail operations and therefore the court did not have jurisdiction based on preemption of the ICCTA). It is not required that the STB make such a determination.

{¶ 60} Several courts have found that a taking by eminent domain of railroad land is preempted. However, it is important to note that such cases generally involve a taking of railroad land that was explicitly and clearly being used for railroad transportation. In the current case, Girard did not exercise eminent domain over the portion of the property where the railroad tracks are located. Therefore, this case is distinguishable from those in which eminent domain was used to exert control over property actually containing railroad tracks or when eminent domain interfered with the movement of a train. See *Wisconsin Cent., Ltd. v. Marshfield* (W.D.Wis.2000), 160 F.Supp.2d 1009, 1014 (state-court proceedings were preempted when the city sought to relocate a portion of railroad track); *Buffalo S. RR. Inc. v. Croton-on-Hudson* (S.D.N.Y.2006), 434 F.Supp.2d 241, 244-245 (property that the city sought to appropriate contained railroad track and loading facilities, and therefore the matter was preempted).

{¶ 61} In *District of Columbia v. 109,205.5 Square Feet of Land,* the court approved taking a portion of railroad property through eminent domain. In that case, the court found that federal preemption did not exist when the city sought to acquire railroad land, via condemnation, for a pedestrian and bike trail. The court found that because the trail was set back from the active railroad line and

would not interfere with railroad transportation, the case was "among those generally resolved in the state courts." Similarly, in the current case, Girard seeks to take property set away from the active railroad tracks.

{¶ 62} The majority finds that Girard's action is impliedly preempted because the taking would unreasonably interfere with YBR's railroad operations. Specifically, it holds that Girard's current uses and future plans could ultimately interfere with rail transportation. However, the facts in the record do not support this conclusion. Girard sought to take 41.5 acres of YBR's property, leaving YBR with 13.5 remaining acres. Girard did not seek to appropriate the portion of the property containing the railroad tracks and also allowed a 100–foot right-of-way located to the side of the tracks. While YBR contends that it stored railroad equipment and other items on three to four acres of its property, Girard provided evidence to the trial court, in the form of aerial pictures, that the land in question was not being used and that no railroad storage or activity had been occurring. Even if YBR was conducting such storage, it would be left with 13.5 acres, allowing sufficient room to store these items. In addition, John Dulac, YBR's chief engineering officer, admitted in his deposition that the railroad could use the portion of the right-of-way beside the railroad as its storage or staging area. Under these circumstances, YBR would be able to continue its business as it had previously, without any changes to its procedure or railroad operations. Therefore, the appropriation would not have the effect of interfering with railroad transportation, as required for the application of implied preemption.

{¶ 63} In addition, federal courts have noted that the party challenging eminent domain or condemnation must present evidence in support of the contention that the proceedings would interfere with railroad operations. *Bayou DeChene; Franks*, 593 F.3d at 415. The challenging party cannot make conclusory or unsupported statements, but must instead demonstrate that railroad transportation will actually be prevented or that unreasonable interference would occur. *Bayou DeChene*. Although YBR asserts that it will be prevented from conducting its railroad operations, it cannot show that it uses the property in question for more than just the use of the railroad line and the three or four acres of storage, as noted above, while Girard showed that no interference would occur. See *Bayou DeChene* (where the city cited specific facts supporting its contention that condemnation would not have the effect of interfering with railroad operations, including that the land to be taken to build a road was 275 feet from the railroad itself and 75 feet from the railroad right-of-way and the opposing party did not show interference with railroad operations, a motion to dismiss based on preemption was without merit); *Franks*, 593 F.3d at 415 (there must be some evidence that the alleged interference will be caused specifically by the portion of land that was taken).

{¶ 64} YBR also argues that it was in negotiations to sell the property to TWL, a waste-management company. Such a sale was speculative, as there is no evidence that a definitive sale would occur. If such a sale did not occur, YBR would continue to make little use of the property Girard is seeking to take though eminent domain, as explained above. In addition, in the sales contract, YBR did not reserve any portion of the railroad property for staging, track right-of-way, or other railroad activities, indicating that YBR has limited activity occurring on the subject parcel of land and that no interference will occur. If such a sale were to take place, any additional transportation that resulted from the operations would likely not qualify as railroad transportation, as YBR asserts. See *New York & Atlantic Ry. Co. v. Surface Transp. Bd.* (C.A.2, 2011), 635 F.3d 66, 73 (if a railroad's involvement in transporting waste is limited to transporting cars to and from the facility and the waste company is offering its own services to customers directly, preemption does not apply); *J.P. Rail, Inc. v. New Jersey Pinelands Comm.* (D.N.J.2005), 404 F.Supp.2d 636, 650.

{¶ 65} Even if transportation of waste could be considered railway transportation, YBR has not shown that the existing railway, which Girard does not seek to interfere with, would be insufficient to transport such waste. Although YBR contends that it may need to expand and add another track upon sale of the property to TWL, Girard Engineer Robert Lyden also testified that the acres not appropriated provide sufficient space to build another track for potential future use. Therefore, it is not likely, even if TWL did purchase a portion of YBR's land, that an unreasonable burden or interference with rail transportation would occur, such that implied preemption would apply.

{¶ 66} In this case, the evidence presented supports a finding that YBR will be able to meet its present and future railway needs after Girard's exercise of its eminent-domain authority. Therefore, federal preemption does not apply. I would reverse the decision of the court below and remand this case for further proceedings.