# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 1, 2012

No. 10-11041

Lyle W. Cayce
Clerk

TEXAS CENTRAL BUSINESS LINES CORPORATION,

Plaintiff-Appellee Cross-Appellant

v.

CITY OF MIDLOTHIAN, a Municipal Corporation,

Defendant-Appellant Cross-Appellee

v.

MAALT L.P.; TEXAS PROPERTIES TRUST,

Third Party Defendants-Appellees

Appeals from the United States District Court
for the Northern District of Texas

Before JONES, Chief Judge, STEWART and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Texas Central Business Lines is a terminal and switching railroad operating in the City of Midlothian, Texas. In the fall of 2008, the railroad endeavored to expand its operations with two new projects. The City opposed that expansion, claiming it violated several municipal ordinances. In response, the railroad brought a declaratory judgment action alleging that a federal statute preempted all City ordinances that affect its transloading operations.

No. 10-11041

Transloading is the transfer of commodities between rail cars and trucks, a process used when the ultimate destination of a commodity is not served by a railroad. This is an appeal from the district court's ruling that all except two of the City's requirements were preempted.

We conclude that all efforts by the City to regulate activities that are involved with what is called the Silo Project are preempted. On the other hand, we determine that uses of other parts of the property involved in this litigation were not shown on this record to be subject to preemption. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Texas Central Business Lines (TCB) operates as a railroad common carrier on a line of trackage in Midlothian, Texas. Since 2002, TCB has been in the business of transloading on various portions of a 600-acre industrial park owned by Texas Properties Trust. MAALT, L.P., is a trucking company servicing the oil and natural gas industry. It provides transloading services for sand owned and shipped by Halliburton Energy Services, in Midlothian and in southeast Oklahoma.

At first, TCB transloaded exclusively on 20 acres. Then, on September 1, 2008, TCB acquired a leasehold from Texas Properties Trust for a total of 243 acres. Some of the additional land would facilitate a transloading expansion that is at the center of this litigation. Halliburton experienced increased demand for the sand (referred to as "frac sand") used in hydraulic fracturing (commonly known as "fracking") at its natural gas wells.[1] TCB, MAALT, and Halliburton entered into an agreement to construct and operate a silo-elevation facility to replace a facility that handled transloading by conveyor belt.

---

[1] To improve the flow of natural gas, the surrounding rock is fractured by the application of pressure. Frac sand is pumped into the well in order to prevent the fractures from closing once the pressure is removed.

2

No. 10-11041

To this end, from 2008 to 2009 a "Silo Project" and a "North End Loop" were constructed adjacent to the 20-acre transloading site. The Silo Project consists of twelve large silos in a three-by-four array, a rail spur, and a sand pit that can accommodate the frac sand cargo from two rail cars, an elevator mechanism to lift the sand into a silos, and a truck scale. In addition, there is a small office as well as roadways for trucks to approach the scales and to leave the facility. TCB constructed the roads and rail lines that service the project. It also owns the cement foundation underneath the silos, as well as the rail spur and the access roads. MAALT constructed the silos, which are movable personal property, and other project features. Halliburton has no ownership interest, and neither it nor MAALT has a leasehold. The entire Silo Project, which accounts for 85 percent of TCB's business, is concentrated on four acres.

Much of the remaining 243 acres leased by TCB is undeveloped. In fact, all of TCB's transloading activity aside from the Halliburton frac sand operations continues exclusively on the originally leased 20 acres. The North End Loop consists of four lines of track.[2] That track leads to the Silo Project, but also extends beyond it establishing a link with TCB's other transloading activities. No track is dedicated for a given customer.

Throughout construction of the Silo Project and the North End Loop, the City expressed its view that MAALT and TCB were in violation of various of its substantive and procedural ordinances. This case began when TCB filed suit to enjoin the City, under the preemptive force of the Interstate Commerce Commission Termination Act (ICCTA), from enforcing any ordinances against it. 49 U.S.C. § 10101 *et seq.* Those include: (1) a zoning ordinance that disallows TCB's silo operations as an unauthorized land use and imposes a height restriction on the leasehold (Ordinance No. 89-13 as amended by 2008-16 and

---

[2] For clarity, we adopt the parties' term "North End Loop" while recognizing it is not an actual loop. TCB does not presently have sufficient business to warrant that construction.

No. 10-11041

2008-31), (2) a grading ordinance setting a maximum slope for rail embankments and roads (Ordinance No. 2004-15), (3) a paving requirement contained in the City's standard construction details (Ordinance No. 2004-19), and (4) a flood plain ordinance (Ordinance No. 2005-61).[3]

The City counterclaimed on the issue of preemption and brought claims for the purported violations of its ordinances. It also asserted third-party claims against the property owner – Texas Properties Trust – and against MAALT. The City sought injunctive relief and civil penalties against all the parties.

After a bench trial, the district court held all of the City's ordinances preempted except for the paving requirement, flood plain, and grading ordinances. It dismissed the City's claims and entered judgment. The City timely appealed, and TCB timely cross-appealed arguing that the ICCTA preempted all of the applicable regulations.

## DISCUSSION

The preemptive effect of the ICCTA is a question of law that we review *de novo*. *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc). Because of the presumption against preemption, the party contending that preemption applies has the burden of persuasion. *Elam v. Kansas City So. Ry. Co.*, 635 F.3d 796, 802 (5th Cir. 2011). Yet, that presumption "applies with less force when Congress legislates in a field with 'a history of significant federal presence'" such as railroads. *Id.* at 804 (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000)). Factual findings by the district court are accepted unless clearly erroneous. *See* Fed. R. Civ. P. 52(a)(6).

"When a federal law contains an express preemption clause," it is "the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Commerce of the U.S. v. Whiting*, 131

---

[3] The City has a building code that requires all construction plans to be submitted for pre-clearance and that all construction be open to inspection. City Ordinance 2005-59.

No. 10-11041

S. Ct. 1968, 1977 (2011) (quotation marks and citation omitted). "If a state law is not expressly preempted by the ICCTA, it still may be impliedly preempted if, as applied to a particular case,  it has 'the effect of unreasonably burdening or interfering with rail transportation.'" *Elam*, 635 F.3d at 805 (quoting *Franks*, 593 F.3d at 414).

In the ICCTA, Congress established the Surface Transportation Board ("Board" or STB).  Congress intended to preempt state and local laws that come within the Board's jurisdiction.  *See Franks*, 593 F.3d at 406-07.  The Board has jurisdiction over "transportation by rail carriers."  49 U.S.C. § 10501(b)(1).  Determining whether the ICCTA preempts a state or local law is a two-step inquiry.  First, the law must seek to regulate "transportation," and second, that transportation must be conducted "by a rail carrier."

I.    *Applicability of the Federal Statute*

The ICCTA defines transportation as "services related to . . . movement" by locomotive "including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property."  *Id.* § 10102(9).  As noted, this case involves a category of industrial activity known as transloading.  Of preliminary concern then, is whether the statutory term "transportation" encompasses transloading.  This inquiry need not detain us long.

The undisputed facts of this case are that sand arrives in rail cars traveling on interstate railroad lines operated by the Burlington Northern Santa Fe and Union Pacific railroads.  From there, the rail cars switch onto a short stretch of railroad track that leads to the Silo Project.  At that point, the sand exits into a pit through ports on the cars, is elevated, and is later off-loaded onto trucks that carry the sand to natural-gas wells at distant locations.  This activity satisfies the coverage of the statute as it concerns the "elevation" and also the "storage, handling, and interchange of . . . property" involving the movement of

5

No. 10-11041

a locomotive. *Id.* § 10102(9). Though authority is hardly necessary for this indisputable point, authority is available. *See, e.g., Norfolk So. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 248 (3d Cir. 2007); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005).

Having determined that transloading qualifies as rail transportation, we now must answer whether the particular transloading that is the subject of this appeal is "by a rail carrier," here TCB.[4]

## II. Preemption Under the ICCTA

"Whether a particular activity constitutes transportation *by rail carrier* under section 10501(b) is a case-by-case, fact-specific determination." *Town of Babylon and Pinelawn Cemetery–Petition for Declaratory Order*, STB Finance Docket No. 35057, 2008 WL 275697, *3 (Feb. 1, 2008) (emphasis added), *aff'd. N.Y. & Atl. Ry. Co v. Surface Transp. Bd.*, 635 F.3d 66 (2d Cir. 2011). Although it need not bind us, "we are free to adopt the STB's preemption test to the extent that we find it to be reasonable and a persuasive interpretation of the relevant considerations." *Franks*, 593 F.3d at 414.

The parties direct us to a pair of recent Board opinions considered by the district court. *See Babylon,* 2008 WL 275697 (finding the operations were not transportation by a rail carrier); *City of Alexandria, VA–Petition for Declaratory Order*, STB Finance Docket No. 35157, 2009 WL 381800 (Feb. 17, 2009) (finding there was transportation by a rail carrier). These authorities helpfully identify factors for determining whether the rail carrier is sufficiently involved in the operations. We will explain why the facts of this case make it more analogous to *Alexandria*, and accordingly that these operations were by a rail carrier.

---

[4] There is no dispute that TCB is a rail carrier, defined by the ICCTA as an entity "providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5).

No. 10-11041

These two Board opinions consider a series of pertinent factors. They include: (1) "whether the rail carrier holds out transloading" as part of its business, (2) the "degree of control retained by the [rail] carrier," (3) property rights and maintenance obligations, (4) contractual liability, and (5) financing. *Alexandria*, 2009 WL 381800, at \*2; *see Babylon*, 2008 WL 275697, at \*3-4.

As to the first factor, TCB markets its transloading services to third parties, serves many other customers, and reserves the right to contract with any competitor of MAALT or Halliburton. *See Alexandria*, 2009 WL 381800, at \*3. MAALT, though, cannot sell, process or store sand, nor can it engage in other business at the property. In contrast, the transloader in *Babylon* could "enter into separate disposal agreements in its own name with customers for disposition of commodities." *Babylon*, 2008 WL 275697, at \*4.

Second, TCB's control is shown by its essential role in day-to-day operations. TCB determines where to place the arriving rail cars and switches them from the originating main railroad line to a short-haul track using its own locomotive. When MAALT is ready to unload them, TCB switches the cars to the Silo Project approximately eight to ten at once. TCB alerts MAALT once it has maneuvered two cars into position over the pit. After testing each car's contents, MAALT personnel release the sand through a bottom-hopper door and reseal the car. Then, an elevator transports the sand into the silos. Next, TCB transports two additional cars, which push the now empty cars beyond the pit. This process continues until all the cars are unloaded.

It is true that MAALT off-loads the sand during and after TCB business hours, but at all times it operates with TCB's permission and according to its operating guidelines. These guidelines include rules about where MAALT trucks may drive and park as well as a prohibition on any MAALT logos or signs on the premises. Additionally, TCB pre-approves all of MAALT's truck drivers, and sets transloading safety regulations and other protocols that MAALT must heed

7

as conditions of entry. The *Babylon* rail carrier had "essentially no involvement in the operations at the facility." *Babylon*, 2008 WL 275697, at \*4.

The third factor, though more mixed, also supports our ultimate conclusion. TCB was not the landowner, but it is the lessee of the tract. It is the only party to the transloading with a real-property interest. Although MAALT owns the transload silos, they are personal property and TCB decided where to place them on its leasehold.[5] Also, TCB owns the permanent improvements, including the silos' concrete foundations and pits. Unlike in *Babylon*, TCB has the obligation to maintain the rail tracks. *Babylon*, 2008 WL 275697, at \*4. TCB also designed and constructed those tracks, as well as the spurs and driveways that serve the silos.

Unlike the preceding factors, the fourth factor parallels *Babylon*, the case without ICCTA preemption. There, liability ended for the rail carrier once the train cars where uncoupled at the transloading yard from the delivering locomotive. *Id.* Here, liability similarly ends when transloading begins; under the agreement's terms TCB is indemnified by MAALT for damages once the cars are spotted.

The fifth and final factor, which concerns the financing arrangement, is more neutral. Halliburton pays both TCB and MAALT for their respective services. This is unlike *Alexandria* in which the third-party shipper exclusively paid the railroad, and it is also dissimilar from *Babylon*, because there customers only paid shipping revenues to the transloader. *Compare Alexandria*, 2009 WL 381800, at \*3, *with Babylon*, 2008 WL 275697, at \*4.

Three factors support the conclusion that the transload operations are by a rail carrier, the first two *decisively*, and only one factor weighs against it.

---

[5] Additionally, the construction plans for the silos were subject to pre-approval by TCB. During that process TCB modified their design to ensure compliance with its procedures and the needs of Halliburton.

No. 10-11041

The City urges consideration of authority from the Eleventh Circuit that held there was no preemption on the facts presented there. *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324 (11th Cir. 2001). In that case, the railroad's involvement ended as soon as the commodity – aggregate for cement – entered the property, akin to *Babylon*, 2008 WL 275697, at *4, and the non-railroad shipper was responsible for maintenance. *Fla. E. Coast Ry.*, 266 F.3d at 1327. The railroad's only meaningful connection to the operation was as the lessor of the premises. *Id.*; *see also Norfolk So. Ry. Co*, 608 F.3d at 159 (distinguishing a transloading operation from *Florida East Coast Ry.* on similar grounds). The *Florida East Coast Ry.* decision is factually inapposite.

We conclude that ICCTA preemption applies. We now turn to the City's efforts to affect activities on the site in order to determine preemption's reach.

III. *ICCTA's Impact on the City's Ordinances*

The nature and effect of a local law or regulation is the touchstone for the preemption analysis. *Franks*, 593 F.3d at 410-11. Federal regulation of railroad operations has a long history in this country. Its purpose is to promote "uniformity in such operations and expediency in commerce." *Friberg v. Kansas City So. Ry. Co.*, 267 F.3d 439, 443 (5th Cir. 2001). Those enactments that "have the effect of managing or governing," and not merely incidentally affecting, rail transportation are expressly or categorically preempted under the ICCTA. *Franks*, 593 F.3d at 410. Consequently, we must consider the effect of each contested City ordinance on the transportation operations of TCB to determine whether they manage or govern its operations. In that analysis we are guided by the principle that we are to rely on the district court's factual findings, "unless we are left with 'the definite and firm conviction that a mistake has been committed.'" *S.E.C. v. Res. Dev. Int'l*, 487 F.3d 295, 303 (5th Cir. 2007) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

9

No. 10-11041

A.    *Height Restrictions*

After the trial, the district court found that TCB and MAALT were unable to accommodate Halliburton's demand for frac sand using the older conveyor system. The new silo method reduced the time to unload a rail car from approximately four hours down to between 10 and 15 minutes. Each silo stands at 85 feet, and when their foundations and the elevator system that propels the operation are included, the Silo Project reaches 110 feet skyward. Were the City's 35 foot height restriction enforced, the district court properly found that the Halliburton transloading would be prevented. Because ordinances that "may reasonably be said to have the effect of 'managing' or 'governing' rail transportation" are expressly preempted, this restriction must yield to the ICCTA. *Franks*, 593 F.3d at 410 (quotation marks and citation omitted).

B.    *Standard Construction Details and Grading Ordinance*

1. *Rail Embankments*

The City's grading ordinance prohibits slopes steeper than 4:1, meaning for every four feet in distance there cannot be more than a one foot change in height. The current tracks were constructed according to the undisputed industry-standard grades of 3:1 and 2:1, which are steeper. The ICCTA prohibits the City from controlling how railroad track embankments are constructed. The district court found the City's regulation would directly affect where rail lines could be situated, as well as influence the distance between railroad tracks and the position of track-side equipment. On appeal, the City has not directed us to any evidence that casts doubt on this finding.

We have held express preemption to bar a related restriction that regulated the length of time a train might occupy a road crossing. *See Elam*, 635 F.3d at 807 (Mississippi statute); *and Friberg,* 267 F.3d at 444 (Texas statute). Those cases instruct that state and local law cannot "govern a railroad's decisions in the economic realm." *Elam,* 635 F.3d at 807. Although we have not

10

precisely indicated the meaning of "economic" decisions, we have held that they include decisions "pertaining to train length, speed or scheduling." *Friberg*, 267 F.3d at 444. A city regulation which dictates the construction design and layout of railroad tracks would frustrate economic decision making.

In *Friberg*, the dispute arose after the railroad lengthened a track and started to utilize a formerly little-used portion of track. *Id.* at 440-41. We held that in enacting the ICCTA, Congress had functionally forestalled the Texas legislature from influencing business decisions such as increasing the use of certain portions of track. *See id.* at 444. Similarly here, the ICCTA grants the Board exclusive jurisdiction over the "construction . . . of spur, industrial, team, switching, or side tracks, or facilities," leaving no room for local regulation. 49 U.S.C. § 10501 (b)(2).

If the Board directly regulates the activity, as it does the construction of rail lines, state and local regulation is prohibited. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008). Thus, the ordinances that would apply to the slope or other features of the embankments for the railroad tracks themselves are expressly preempted throughout the 243 acres.

### 2. *Road Grading & Paving*

Whether the grading ordinance is preempted as applied to the vehicular roads and parking areas requires separate analysis. *Franks*, 593 F.3d at 410. We also now consider the City's requirement that all roads and parking areas be paved in concrete. Congress's intent is the foundation which supports the reach of preemption under any statute. *Elam*, 635 F.3d at 803. Congress best expresses itself through statutory language. *Whiting*, 131 S. Ct. at 1977.

Roads for vehicles can satisfy the ICCTA's definition of transportation: any "property, facility, [or] instrumentality . . . related to the movement of passengers or property, or both, by rail." *Id.* § 10102(9)(A). That definition assists, but does not answer whether these roads and parking lots relate to

movement of property by a rail carrier. We must again engage in the fact-intensive inquiry that takes full cognizance of the parties' respective roles in transloading rather than viewing the transloading in the abstract.

Undertaking our *de novo* review, *Franks*, 593 F.3d at 407, we hold that the City's grading ordinance and its requirement that roads be paved in concrete are expressly preempted insofar as the roads support the TCB-MAALT-Halliburton transloading. The reasoning is similar to that discussed for the rail embankments. Such regulations have the effect of managing the economic decisions of TCB in the context of transportation covered under the ICCTA. Thus, the City may not enforce these regulations against: (1) the roads used to connect the Midlothian Parkway Gate with the Silo Project,[6] or (2) any other roads and areas specifically constructed for or used in *this* transloading.

Before moving further in our analysis, we pause to fix the outer boundaries of today's decision. Other than as we just discussed with the railroad track embankments, we are not deciding whether ICCTA preemption applies to TCB's entire 243-acre lease, or whether it applies to the 20 acres of the original transload yard, which continues to be used to facilitate transloading for customers other than Halliburton. This is because – as we have explained – not even all transloading involving railroad cars and tractor-trailer rigs constitutes "transportation by rail carriers." *See* 49 U.S.C. § 10501(b)(1). All we determine in this appeal, on this record, is that the TCB-MAALT-Halliburton operations concerning the Silo Project and North End Loop meet this definition. Our express-preemption conclusions only pertain to the roads and parking areas used in connection with that transloading.

On cross-appeal, TCB asks that we rule that everything it does or might do on its largely vacant 243-acre leasehold is beyond the reach of the City's

---

[6] Uncontested trial testimony revealed that all vehicle traffic enters and exits through this gate at the north end of the property.

regulation. We decline that invitation. This litigation began as a request for a declaratory judgment brought by TCB. Under the Declaratory Judgment Act, a federal court may only "declare the rights and other legal relations" of parties in "a case of actual controversy." 28 U.S.C. § 2201; Fed. R. Civ. P. 57. That controversy must be "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936). "This circuit interprets the § 2201 'case of actual controversy' requirement to be conterminous with Article III's 'case or controversy' requirement." *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006).

The district court properly declined to "make findings concerning prospective transloading" because they were "insufficiently concrete to permit the required factually intense evaluation." In addition to speculative uses, the trial record also indicates that TCB currently provides transloading services on the 20-acre tract, in part using its older conveyor system, for a variety of commodities aside from frac sand, and for many customers besides Halliburton.[7] The evidence discernable from the record about those other operations suggests that they are highly individualized with respect to each customer and each commodity. The district court's careful analysis of the relationships among the trucker, the owner of the silos, and the railroad at the small Silo Project was not undertaken as to the larger and older transloading operation.

The problem with too large a preemption blanket over TCB's operations is revealed by TCB's own briefing. It acknowledges it has

> transload agreements with shippers, consigners and their agents to fit the unique circumstances of each. TCB performs the physical act of transloading itself for some of its customers and has contracts with independent contractors to perform the transloading for others. TCB [also] allows certain customers to self-transload . . . .

---

[7] Additionally, at an adjacent distribution and processing center, TCB serves a client by interchanging and switching (but not transloading) rail cars carrying automobiles.

No. 10-11041

TCB insists that it has made an adequate case for preemption as to the entire 243 acres. We see no express preemption. Implied preemption applies if the regulation has "the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 414. TCB argues that the City's limitations diminish the potential locations for expansion to meet potential future customer demand. The mere prospect that there will be less space going forward, on this extensive tract, without definite plans to develop, and without an explanation of how future projects would be affected does not amount to an unreasonable burden at this time.

In a similar vein, TCB contends that road placement is dictated by demand from customers, whose requirements and identities are constantly in flux. Being obligated to pave any roads would hamper its flexibility to redesign the path of its roads. Yet certain other district court findings belie this account of recurring facility reorganization. To illustrate, TCB admitted at trial that no current users require it to alter the configuration of its roads. Relatedly, the court found that "[m]oving the silos would be a substantial undertaking, and there is no evidence in the record that any party contemplates moving the silos in the foreseeable future." In *Franks,* we rejected a railroad's implied preemption argument that rested on similar generalizations and held that the proponent of preemption must make specific record showings to prevail on "unreasonabl[e] burden or interfere[nce]." *Franks*, 593 F.3d at 415. TCB's implied preemption claims therefore fail for inadequate support.

Notwithstanding the multiplicity of factual situations, TCB sought a ruling from the district court that all of TCB's third-party transloaders, including MAALT, as well as customers that empty rail cars themselves (so called self-transloaders) were within the jurisdiction of the STB because they allegedly work under the auspices of TCB. We are uncertain whether the district court meant to embrace that reasoning in its holding that in addition to

the "Halliburton transloading," the "other transloading done at the Transload Center constitutes transportation by a rail carrier."[8]  If the district court did intend to hold that all transloading outside of the Silo Project was covered by preemption, the evidence recited in the district court's memorandum order and in the briefing before us does not support such a conclusion.

We remand on the question of preemption as to transloading outside of the Silo Project and North End Loop, specifically as to the 20 acres of the earlier transloading.  The district court on remand will be better positioned than this court to apply the two STB precedents to the full array of facts presented.  In that inquiry, the district court should apply *Alexandria* and *Babylon* in determining whether Congress expressly preempted the road grading and paving requirements on parts of the property other than those related to the Silo Project and North End Loop.  The district court may also weigh the facts to evaluate whether the test for implied preemption, discussed earlier, is satisfied.

Among the questions for a declaratory judgment is whether the issue as to other tracts and activities is sufficiently joined, too speculative, or otherwise inappropriate for a ruling.  The evidence suggests this dispute has been generated by the Silo Project.  If in fact the Silo Project is not just the principal but is the only true concern, the district court must be alert to avoid issuing an advisory opinion on all of the remainder.

## C.    *Health & Safety Exception*

The City and *amici*[9] argue that Midlothian's ordinances are exempt from preemption on the basis of an exception for health and safety regulations.  *See,*

---

[8] Though it never expressly defined "Transload Center," the district court's opinion suggests that the term refers at least to the 20-acre old transload yard as well as the approximately four acre Silo Project and North End Loop.  In some places in the analysis, the court seemingly refers to the entire 243-acre leasehold as the "Transload Center."

[9] The Texas Municipal League, National League of Cities, and Texas Chapter of the American Planning Association filed a joint amicus brief in this case.

*e.g.*, *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 253-54; *Green Mtn. R.R. Corp.*, 404 F.3d at 643; *Fla. E. Coast*, 266 F.3d at 1329.  We disagree.

This circuit sitting *en banc* in *Franks* set out the framework for ICCTA preemption.  Applying *Franks,* we have already concluded today that the City's ordinances manage or regulate rail transportation.  Nothing about that analysis calls on us to evaluate the wisdom or propriety of an exception for health and safety.  *Cf. Island Park, LLC v. CSX Transp.,* 559 F.3d 96, 105 (2d Cir. 2009) (noting some courts and the STB "have declined to find pre-emption where state or local regulations does not interfere with rail operations"); *Fla. E. Coast*, 266 F.3d at 1331 (holding laws having the "effect of managing or governing rail transportation" preempted, "while permitting the continued application of laws having a more remote or incidental effect on rail transportation.").

Perhaps in some other context, an exception for health and safety regulations would apply.  Not here.

D.    *Flood Plain Ordinance*

There remains one final matter to address.  The district court found that nothing about the Silo Project or North End Loop construction violated the City's flood plain ordinance.  The court credited testimony that very little of the existing construction was in the flood plain and that any impact would be negligible.  We find no clear error.  *See* Fed. R. Civ. P. 52(a).

Though the parties continue to disagree over whether the ICCTA preempts the City's floodplain ordinance, this is little more than "an abstract dispute about the law" without an existing or impending violation of the ordinance. *Alarez v. Smith,* 130 S. Ct. 576, 580 (2009).  And the Supreme Court has instructed that "a dispute  solely about the meaning of a law, abstracted from any concrete actual or threatened harm, falls outside the scope of the constitutional words 'Cases' and 'Controversies'" and resultantly is beyond our province under Article III.  *Id.* at 580-81 (citations omitted).

No. 10-11041

At oral argument, TCB argued that if economic conditions warrant, it may decide to expand into the flood plain on some future date.  That claimed injury is "contingent on future events that may not occur as anticipated, or indeed may not occur at all [and thus] the claim is not ripe for adjudication." *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2010) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81 (1985)); *see also id.* (explaining that the "the doctrines of ripeness and standing often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury") (quotation marks and citation omitted).

## CONCLUSION

We REVERSE the district court's holding of no preemption as to the standard construction details and road grading ordinance, resting our decision on express preemption under the ICCTA.  As explained, our express preemption holding only pertains to the road and paving areas used in connection with the TCB-MAALT-Halliburton transloading analyzed herein.  This preemption renders the City's appeal from the denial of its request for civil penalties for ordinance violations moot.  We REVERSE what we have concluded is likely a holding by the district court that there is express preemption as to the older, 20-acre transloading center and REMAND for further proceedings. The proceedings should consider whether there is a live controversy as to some or all of the other property.  We AFFIRM the district court's other rulings.