THE CITY OF GIRARD, APPELLANT, *v*. YOUNGSTOWN BELT RAILWAY

COMPANY ET AL., APPELLEES.

[Cite as *Girard v. Youngstown Belt Ry. Co.,*

134 Ohio St.3d 79, 2012-Ohio-5370.]

*Federal preemption—Interstate Commerce Commission Termination Act—49 U.S.C. 10101 et seq.—Eminent domain.*

(No. 2011-1850—Submitted June 19, 2012—Decided November 21, 2012.)

APPEAL from the Court of Appeals for Trumbull County,

No. 2010-T-0079, 196 Ohio App.3d 271, 2011-Ohio-4699.

_____

**MCGEE BROWN, J.**

**{¶ 1}** In this case, we are called upon to determine the extent to which the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. 10101 et seq., preempts a state's eminent-domain action over a parcel of property owned by a railway company. Based on our interpretation of the legislation at issue and its application to the unique facts of this case, we find no preemption, and we therefore reverse the judgment of the court of appeals.

**Factual and Procedural Background**

**{¶ 2}** Since 1997, Youngstown Belt Railway Company ("Youngstown Railway") has been the owner of a 55-acre parcel of land, called Mosier Yard. Youngstown Railway operates an active track that runs along the outside of the eastern border of Mosier Yard. The remainder of the parcel is vacant, though Youngstown Railway uses three to four acres for temporary staging and storage approximately once or twice per year.

**{¶ 3}** In July 2004, Youngstown Railway entered into an initial purchase agreement with Total Waste Logistics of Girard, L.L.C., for the purchase of

Mosier Yard in fee simple at the rate of $5,000 per acre. In April 2005, the parties entered into a more comprehensive purchase agreement for the purchase of Mosier Yard for a total of $275,000. The sale was contingent upon Total Waste Logistics' attainment of appropriate permits to use the property as a construction-and-demolition-debris landfill. The purchase agreements make no mention of any future intent by Total Waste Logistics to grant easements to Youngstown Railway or any future intent to enter into a debris-hauling-service agreement with Youngstown Railway. The sale to Total Waste was never consummated.

{¶ 4} In April 2006, the city of Girard passed a resolution declaring its intent to appropriate a portion of Mosier Yard, covering approximately 41.5 acres. The 13.5 acres to be retained by Youngstown Railway included the existing track and right-of-way as well as additional space for the staging and storing of materials or for the potential future construction of an additional track. In June 2006, the city passed an additional resolution, declaring the value of the property to be $41,500. After the city and Youngstown Railway were unable to reach any agreement, the city commenced an appropriation action at the Trumbull County Court of Common Pleas in November 2006.

{¶ 5} Youngstown Railway filed a motion for summary judgment, asserting that the appropriation proceedings were preempted by the ICCTA and subject to the exclusive jurisdiction of the Surface Transportation Board ("STB") because the intended appropriation would have the effect of burdening or interfering with railway transportation. Youngstown Railway pointed out that its current location for storing materials is outside the 13.5-acre area and further asserted that it had planned since purchasing the property in 1997 to develop the property for "industrial, transloading, and/or warehousing purposes to be serviced by rail," as evidenced by its current purchase agreement with Total Waste Logistics.

2

**{¶ 6}** The city opposed Youngstown Railway's motion and filed its own motion for summary judgment, arguing that the appropriation would have no effect on Youngstown Railway's operation of its railway. The city pointed out that the appropriated 41.5 acres did not contain any existing or abandoned rail lines or approach the right-of-way of any neighboring rail lines and that Youngstown Railway's chief engineering officer agreed that the 13.5 acres to be retained by Youngstown Railway would accommodate its need for storage space. The city further asserted that Youngstown Railway's plan to sell the entire 55-acre parcel in fee simple to a landfill company undermined Youngstown Railway's stance that the land would be used for railway transportation.

**{¶ 7}** Youngstown Railway's response to the city's motion pointed to the affidavit of Youngstown Railway's president, in which he averred that in addition to the parties' written contract, Youngstown Railway and Total Waste Logistics "entered a verbal agreement regarding future business relations" between the two companies. The president as well as the director of operations for Total Waste Logistics averred that once Total Waste Logistics obtained the necessary permits to create the landfill, Total Waste Logistics planned to grant easements to Youngstown Railway so that Youngstown Railway could transport landfill debris into the landfill by rail.

**{¶ 8}** In its May 2010 judgment entry, the trial court held that the city's appropriations proceedings were preempted by the ICCTA. However, the court ordered the parties to apply to the STB "for a determination as to whether it chooses to exercise its right of preemption" under the ICCTA and held that it was temporarily retaining jurisdiction pending the STB's response. The Eleventh District Court of Appeals held that the trial court's order was not appealable and remanded the matter for a definitive ruling on whether preemption applied.

**{¶ 9}** Upon remand, the trial court held that when a railway company uses land on an annual basis for storing and staging materials, an appropriation

action for that land would be preempted by the ICCTA both expressly, under a per se analysis, and impliedly, under an as-applied analysis. The trial court held that it would be inappropriate to consider Youngstown Railway's potential sale to Total Waste Logistics or any other "futuristic intention," but determined that Youngstown Railway's use of a portion of the appropriated land for storage caused the city's action to be preempted by the ICCTA. The trial court therefore committed jurisdiction to the STB.

{¶ 10} A majority of the panel from the Eleventh District affirmed the trial court's decision, though not without rejecting a large portion of the trial court's underlying reasoning. *Girard v. Youngstown Belt Ry. Co.*, 196 Ohio App.3d 271, 2011-Ohio-4699, 963 N.E.2d 193. Contrary to the trial court's conclusion, the Eleventh District held that the city's appropriation action was not expressly preempted by the ICCTA, because its "remote" and "incidental" effect "would not function to regulate railroad transportation." *Id.* at ¶ 41. Under the as-applied analysis, the Eleventh District held that Youngstown Railway's use of a small portion of the appropriated land for storage was not enough, by itself, to trigger implied preemption. The appellate court further held that it was not inappropriate to consider Youngstown Railway's future plans within the federal-preemption analysis. The Eleventh District then determined that Youngstown Railway's role in its future plans with Total Waste Logistics fell within the definition of railway transportation and held that the city's appropriation action was impliedly preempted by the ICCTA because it would unreasonably interfere with that railway transportation. Alternatively, the Eleventh District held that the city's appropriation action would be preempted even if Youngstown Railway's plans with Total Waste Logistics were not realized, because the appropriation action would interfere with Youngstown Railway's unspecified future plans to expand railway operations. The Eleventh District further held that Youngstown Railway's unspecified plans could have an effect on interstate commerce, that

future plans related to the "economic realm" of a railway fall within the purview of the ICCTA, *id.* at ¶ 54, and that the city's prevention of the development of such plans would have a negative economic impact on the railway, requiring preemption.

{¶ 11} A dissenting judge would have found that federal preemption did not apply to the city's action because Youngstown Railway would have been able to continue its present railway operations and store its materials on the 13.5 acres that it would retain after the appropriation, because Youngstown Railway did not meet its burden of proving that the appropriation would interfere with future operations, and because Youngstown Railway's hypothetical services to Total Waste Logistics do not fall within the definition of railway transportation.

{¶ 12} We accepted discretionary jurisdiction to hear the city's appeal, 131 Ohio St.3d 1437, 2012-Ohio-331, 960 N.E.2d 986, which addresses two main issues: first, the extent to which a state court of common pleas may exercise jurisdiction to determine whether ICCTA preemption applies, and second, whether preemption under the ICCTA applies to the particular appropriation action in this case.

## Analysis

### *Federal Preemption of State Law*

{¶ 13} The doctrine of federal preemption originates from the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding." U.S. Constitution, Article VI, cl. 2. Pursuant to the Supremacy Clause, the United States Congress has the power to preempt state laws. *In re Miamisburg Train Derailment Litigation*, 68 Ohio St.3d 255, 259, 626 N.E.2d 85 (1994).

**{¶ 14}** Preemption may be either expressed or implied. *Gade v. Natl. Solid Wastes Mgt. Assn.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). Express preemption occurs when Congress explicitly defines "the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Implied preemption of state law may occur when Congress has created a " 'scheme of federal regulation * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Id.* at 79, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

**{¶ 15}** Preemption is fundamentally a question of congressional intent. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). However, in all preemption cases, we start with the presumption that the states' historic police powers shall not be superseded by federal law unless that is shown to be the clear and manifest purpose of Congress. *Rice* at 230. *See also Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action"). The party seeking to overcome the presumption against preemption bears a heavy burden. *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). Further, the scope of preemption, if any, is to be determined while keeping this presumption in mind. *Medtronic* at 485. Accordingly, "[t]he applicable preemption provision must be read narrowly 'in light of the presumption against pre-emption of state police power regulations.' " *In re Miamisburg* at 264, quoting *Cipollone* at 518.

***State Court Jurisdiction to Determine Preemption***

{¶ 16} As an initial matter, we note that the Trumbull County Court of Common Pleas correctly exercised jurisdiction to entertain the city's action and to consider the merits of Youngstown Railway's preemption claim under the ICCTA. In the absence of a patent and unambiguous lack of jurisdiction, a court of general subject-matter jurisdiction has the ability to determine the bounds of its own jurisdiction. *State ex rel. Enyart v. O'Neill*, 71 Ohio St.3d 655, 646 N.E.2d 1110 (1995). In determining the scope of its jurisdiction under a federal statute, a state court of general subject-matter jurisdiction possesses a " 'deeply rooted presumption in favor of concurrent' " state and federal jurisdiction. *Mims v. Arrow Fin. Servs., L.L.C.*, ___ U.S. ___, ___, 132 S.Ct. 740, 748, 181 L.Ed.2d 881 (2012), quoting *Tafflin v. Levitt*, 493 U.S. 455, 459, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990); s*ee also Herbst v. Resolution Trust Corp.*, 66 Ohio St.3d 8, 10, 607 N.E.2d 440 (1993). The presumption of concurrent jurisdiction can be overcome only if (1) the federal statute expressly vests jurisdiction exclusively in the federal courts, (2) the legislative history unmistakably implies that jurisdiction was to be vested exclusively in the federal courts, or (3) state jurisdiction is clearly incompatible with concurrent federal jurisdiction. *Elek v. Huntington Natl. Bank*, 60 Ohio St.3d 135, 138, 573 N.E.2d 1056 (1991), quoting *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981).

{¶ 17} State courts across the nation regularly evaluate preemption under the ICCTA. *See, e.g.*, *Wolf v. Cent. Oregon & Pacific RR., Inc.*, 230 Or.App. 269, 216 P.3d 316 (2009) (the ICCTA did not preempt state jurisdiction over grade crossings); *Seattle v. Burlington N. RR. Co.*, 145 Wash.2d 661, 669, 41 P.3d 1169 (2002) (the ICCTA preempted regulations regarding signaling at railroad crossings); *In re Vermont Ry.*, 171 Vt. 496, 503, 769 A.2d 648 (2000) (the ICCTA did not preempt a city's zoning conditions for a railway's salt-shed facility).

Because the ICCTA does not explicitly deny concurrent jurisdiction to state courts and state courts routinely adjudicate matters regarding the ICCTA, the Trumbull County Court of Common Pleas did not exceed its authority in evaluating whether the ICCTA preempted the city of Girard's ability to institute eminent-domain proceedings against Youngstown Railway. Consequently, this court possesses the authority to review the decisions of the trial and appellate courts and offer final judgment.

### *Application of the ICCTA*

{¶ 18} The federal law at issue in this case is the ICCTA, which abolished the Interstate Commerce Commission, created the STB, and granted the STB exclusive jurisdiction over certain aspects of interstate rail activity. 49 U.S.C. 10101 et seq. The ICCTA was enacted to encourage competitive rates for rail transportation, to minimize regulatory control, and to promote efficiency as well as public health and safety. 49 U.S.C. 10101.

{¶ 19} The ICCTA grants exclusive jurisdiction to the STB over

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. 10501(b)(1) and (2).

{¶ 20} The ICCTA defines "transportation" to include

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. 10102(9)(A) and (B).

{¶ 21} The ICCTA contains an express preemption clause, which provides: "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. 10501(b).

{¶ 22} In shorter form, the ICCTA provides the STB with exclusive jurisdiction over all physical instrumentalities possessed and all services provided by rail carriers that are related to the movement of passengers and/or property. This broad, sweeping language shows Congress's intent to preempt any state effort to regulate rail transportation. However, although the ICCTA's wording is expansive, the ICCTA's legislative history indicates that Congress did not intend to preempt any and all state laws that might touch upon or indirectly affect railway property. *Emerson v. Kansas City S. Ry. Co.,* 503 F.3d 1126, 1131 (10th Cir.2007), quoting H.R.Rep. No. 104-422, at 167 (1995), reprinted in 1995 U.S.C.C.A.N. 850, 852 ("the exclusivity [of 49 U.S.C. 10501(b)] is limited to remedies with respect to rail regulation-not State and Federal law generally. * * * [State and federal laws] remain fully applicable unless specifically displaced,

because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation").

{¶ 23} Further, various federal circuit courts have adopted the position that "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation, Black's Law Dictionary 1286 (6th Ed.1990), while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Florida E. Coast Ry. Co. v. W. Palm Beach,* 266 F.3d 1324, 1331 (11th Cir.2001). *See also Franks Invest. Co., L.L.C. v. Union Pacific RR. Co.*, 593 F.3d 404, 410 (5th Cir.2010); *PCS Phosphate Co., Inc. v. Norfolk S. Corp.,* 559 F.3d 212, 218 (4th Cir.2009); *Adrian & Blissfield RR. Co. v. Blissfield,* 550 F.3d 533, 539 (6th Cir.2008); *New York Susquehanna & W. Ry. Corp. v. Jackson,* 500 F.3d 238, 252 (3d Cir.2007). We therefore adopt this interpretation of the ICCTA.

### *Categorical Preemption*

{¶ 24} The preemption analysis regularly employed by the STB distinguishes between express and implied preemption by classifying actions as "per se preempted," or "categorically preempted," versus "preempted as applied." *Adrian & Blissfield R. Co.,* 550 F.3d at 539-540. Turning first to the issue of categorical preemption, the Eleventh District Court of Appeals held, and we agree, that the city's eminent-domain action against a portion of Mosier Yard is not categorically preempted by the ICCTA.

{¶ 25} The STB has recognized that categorical preemption applies to two main categories of state or local actions:

> The first is any form of state or local permitting or
> preclearance that, by its nature, could be used to deny a railroad the

10

ability to conduct some part of its operations or to proceed with activities that the Board has authorized. * * *

Second, there can be no state or local regulation of matters directly regulated by the Board–such as the construction, operation, and abandonment of rail lines (see 49 U.S.C. 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (see 49 U.S.C. 11321-11328); and railroad rates and service (see 49 U.S.C. 10501(b), 10701-10747, 11101-11124).

*CSX Transp., Inc.—Petition for Declaratory Order*, STB Finance Docket No. 34662, 2005 WL 1024490, at *2 (May 3, 2005).

{¶ 26} Clear-cut examples of categorically preempted state actions include state and local permitting laws and zoning regulations. *See Auburn v. United States Govt.*, 154 F.3d 1025 (9th Cir.1998) (attempt to impose local environmental-permitting laws on improvements and repairs to a rail line that had been approved by the STB); *Norfolk S. Ry. Co. v. Austell*, N.D.Ga. No. CIVA1:97-CV-1018-RLV, 1997 WL 1113647 (Aug. 18, 1997) (attempt to impose land-use-permitting requirement pursuant to local zoning ordinance). Courts also generally recognize that eminent-domain actions that seek to take property containing active rail lines are categorically preempted by the ICCTA. *See Union Pacific RR. Co. v. Chicago Transit Auth.*, N.D.Ill. No. 07-cv-229, 2009 WL 448897, at *6-7 (Feb. 23, 2009) (a city's attempted condemnation of a 95-foot, 2.8-mile strip of rail line's right-of-way, including multiple active tracks, was categorically preempted by the ICCTA); *Wisconsin Cent. Ltd. v. Marshfield*, 160 F.Supp.2d 1009 (W.D.Wis.2000) (holding that the city's attempted condemnation of a portion of a railroad's track was categorically preempted by the ICCTA).

{¶ 27} However, neither the federal circuit courts nor the STB has held that there is any "blanket rule that any condemnation action against railroad property is impermissible." *Lincoln Lumber Co.—Petition for Declaratory Order*, STB Finance Docket No. 34915, 2007 WL 2299735 (Aug. 10, 2007). Instead, because eminent-domain actions are specific to the unique parcel of land the state seeks to control, they cannot necessarily be categorized as laws or regulations of general applicability that seek to manage or govern rail transportation in general. *Union Pacific RR. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 679 (7th Cir.2011). Because eminent-domain actions are unique, and because this case does not involve more extreme circumstances such as an attempted taking of an active rail line, we hold that the categorical-preemption analysis is inapplicable here.

### As-Applied Preemption

{¶ 28} When a proposed state action against a rail carrier is not categorically preempted pursuant to the foregoing analysis, courts have generally applied the STB's standards to determine if the action is preempted as applied. *See Franks Invest. Co., L.L.C.*, 593 F.3d at 413-414; *PCS Phosphate Co., Inc.*, 559 F.3d at 220-221; *Adrian & Blissfield RR. Co.*, 550 F.3d at 540-541; *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1133 (10th Cir.2007). The STB has articulated the standard for as-applied ICCTA preemption as follows: "For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether [the] action would have the effect of preventing or unreasonably interfering with railroad transportation." *CSX Transp., Inc.,* 2005 WL 1024490, at *3. Thus we are required to conduct a fact-specific inquiry to determine whether the city's action is preempted by the ICCTA in this case. Because it is Youngstown Railway who is seeking ICCTA preemption, and because of our general presumption against preemption,

Youngstown Railway bears the burden of persuasion here. *See Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 802 (5th Cir.2011).

{¶ 29} Our analysis at this point risks becoming tenuous, because the parties have presented us not with the mere present reality of Youngstown Railway's operations at Mosier Yard, but with multiple hypothetical future scenarios. Under normal circumstances, we decline to address hypothetical questions. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 48; *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970). However, some courts have found it appropriate to examine a railway company's future intentions when determining whether a state action will unreasonably interfere with railway transportation. *See Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 862 (8th Cir.2005); *Union Pacific RR. Co.*, 647 F.3d at 681; *Reading Blue Mountain & N. RR. Co. v. UGI Util., Inc.*, M.D.Penn. No. 3:11-CV-2182, 2012 WL 251960 (Jan. 25, 2012). We therefore find it appropriate to entertain Youngstown Railway's hypothetical scenarios only in the specific context of our as-applied ICCTA preemption.

### *Present Use of Property Does Not Call for Preemption*

{¶ 30} Starting with the present status of Mosier Yard, we hold that there is no preemption under the ICCTA. It is undisputed that the portion of Mosier Yard sought to be appropriated by the city contains no active or abandoned tracks, contains no portion of rights-of-way of any rail lines, contains no permanent structures, and is undeveloped as a whole. These facts make Youngstown Railway's situation completely distinguishable from many cases finding preemption as applied under the ICCTA. *See, e.g.*, *Lincoln*, 414 F.3d 858 (preemption based on interference with right-of-way); *Soo Line RR. Co. v. St. Paul*, 827 F.Supp.2d 1017 (D.C.Minn.2010) (preemption based on interference with right-of-way); *Wisconsin Cent. Ltd. v. Marshfield,* 160 F.Supp.2d 1009 (W.D.Wisc.2000) (preemption based on attempted taking of rail line); *Union*

*Pacific RR. Co.,* N.D.Ill. No. 07-cv-229, 2009 WL 448897 (preemption based on interference with right-of-way).

{¶ 31} The sole factor that could potentially support a finding of unreasonable interference with railway transportation is the fact that Youngstown Railway uses "three to four random acres" of Mosier Yard annually for staging and storing materials. *Girard*, 196 Ohio App.3d 271, 2011-Ohio-4699, 963 N.E.2d 193, at ¶ 15. However, Youngstown Railway's agents have admitted that their need for the staging and storage of materials is not married to one specific area of Mosier Yard and that the remaining land after the taking would accommodate the storage of materials. *Compare Lincoln*, 414 F.3d at 861 (storage and loading area, located in right-of-way, could not be accommodated elsewhere). There is no permanent structure or any other impediment that prevents Youngstown Railway from storing materials in one area versus another on the property; the only requirement is a general need for three to four acres near the rail line, which Youngstown Railway would still have after the taking. Accordingly, under the present scenario, Youngstown Railway has not established that the proposed taking would interfere with railway transportation, and preemption under the ICCTA would not be called for.

### *Future Operations by Total Waste Logistics Do Not Constitute Transportation by a Railway Carrier*

{¶ 32} As for Youngstown Railway's proposed future scenario of selling Mosier Yard to Total Waste Logistics, we hold that there is also no preemption under the ICCTA. Based on the plain and straightforward language of the written contract between Total Waste Logistics and Youngstown Railway, Total Waste Logistics will become the owner in fee simple of the entirety of Mosier Yard, including the area sought to be appropriated by the city. Despite this finalized written instrument, agents of both Total Waste Logistics and Youngstown Railway averred that the parties entered into contemporaneous oral agreements

14

that Total Waste Logistics would grant easements and enter into service contracts with Youngstown Railway in order to transport waste into Total Waste Logistics landfill. Even if we were to give credence to this parol evidence, the future activities that would take place on Total Waste Logistics property would not constitute railway transportation.

**{¶ 33}** It is true that the loading and unloading of transported materials, including waste materials, may fit within the broader definition of "transportation" as defined by the ICCTA. 49 U.S.C. 10102(9). However, satisfaction of the term "transportation" does not end the analysis. In order for transportation to constitute railway transportation under the ICCTA, the activity must be " 'performed by, or under the auspices of, a "rail carrier." ' " *New York & Atlantic Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 71-72 (2d Cir.2011), quoting *Babylon—Petition for Declaratory Order*, STB Finance Docket No. 35057, 2008 WL 4377804 (Sept. 24, 2008). A "rail carrier" is defined as an entity "providing common carrier railroad transportation for compensation." 49 U.S.C. 10102(5). "The fundamental test of common carriage is whether there is a public profession or holding out to serve the public." *New England Transrail, L.L.C.—Construction, Acquisition, and Operation Exemption*, STB Finance Docket No. 34797, 2007 WL 1989841, *6 (June 29, 2007).

**{¶ 34}** When the loading, unloading, or transloading of materials is performed by a rail carrier, on property owned by the rail carrier, through services rendered as a common carrier to the public, such activity has been found to fall under the purview of the ICCTA. *See, e.g.*, *New England Transrail* at *8-10 (transloading and storage of various commodities and waste materials, but not processing of waste, would constitute rail transportation if the owner and operator of the facility were authorized as a rail carrier); *Green Mountain RR. Corp. v. Vermont,* 404 F.3d 638, 644 (2d Cir.2005) (transloading and temporary storage of commodities by a rail carrier constituted rail transportation and was governed by

the ICCTA); *Norfolk S. Ry. Co.*, 1997 WL 1113647, at *6 (operation of intermodal facility by rail carrier constituted rail transportation and was governed by the ICCTA).

{¶ 35} However, when a transloading, shipping, or receiving facility is operated by an entity that is not a rail carrier, the facility's activities are not considered to fall under the ICCTA, regardless of whether railway transportation is used up to the point that the materials arrive or depart from the facility. *See, e.g.*, *Babylon*, 2008 WL 4377804 (transloading of construction and demolition debris by non-rail-carrier tenant of railway property did not constitute rail transportation and was not governed by the ICCTA); *New York & Atlantic Ry. Co.*, 635 F.3d at 73 (waste-transfer facility, operated by a nonrail carrier that was not acting as an agent for any rail carrier, did not constitute rail transportation and was not governed by the ICCTA); *Florida E. Coast Ry. Co.*, 266 F.3d at 1332-1336 (construction-aggregate distribution center, operated by a non-rail-carrier lessee of railway property, did not constitute rail transportation and was not governed by the ICCTA); *Milford, Mass.—Petition for Declaratory Order*, STB Finance Docket No. 34444, 2004 WL 1802301 (Aug. 11, 2004) (despite contractual agreement with a rail carrier, the transloading of steel by a nonrail carrier in a manner that was not being offered as part of common-carrier services for the public did not constitute rail transportation and was not governed by the ICCTA); *Hi Tech Trans, L.L.C. v. New Jersey*, 382 F.3d 295, 308-309 (3d Cir.2004) (bulk-waste transloading facility, operated by a nonrail carrier on rail carrier's property, did not constitute rail transportation and was not governed by the ICCTA). The proposed ownership and operation of Mosier Yard by Total Waste Logistics would fall squarely within this latter category.

{¶ 36} The *Hi Tech* decision in particular informs our decision today. In that case, a nonrail carrier, Hi Tech, and a rail carrier, Canadian Pacific Railroad, contracted for Hi Tech to build and operate a solid-waste facility on the railroad's

property. *Id.* at 298-299. Construction and demolition waste was to be delivered to Hi Tech's facility by truck, and after processing the waste at Hi Tech's facility, the waste was loaded into rail cars to be transported out of the property by Canadian Pacific Railroad. *Id.* The Third Circuit determined that Hi Tech's facility

> does not involve "transportation by rail carrier." The most it involves is transportation "*to* rail carrier." * * * The mere fact that the [Canadian Pacific Railroad] ultimately uses rail cars to transport the [construction and demolition] debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier." Indeed, if Hi Tech's reasoning is accepted, any nonrail carrier's operations would come under the exclusive jurisdiction of the STB if, at some point in a chain of distribution, it handles products that are eventually shipped by rail by a railcarrier [sic]. The district court could not accept the argument that Congress intended the exclusive jurisdiction of the STB to sweep that broadly, and neither can we.

(Emphasis sic.) *Id.* at 308-309.

{¶ 37} The facts here are strikingly similar to those in *Hi Tech*, with a few exceptions: Youngstown Railway will be delivering rather than receiving construction and demolition debris, and Total Waste Logistics will have ownership and control of both the waste facility and the property as a whole. Thus, unlike in *Hi Tech*, what we have here is "transportation *from* rail carrier" rather than "transportation *by* rail carrier." We cannot conclude that the activities on Mosier Yard would constitute railway transportation from the mere fact that

waste materials are delivered into the property through the use of railway transportation.

{¶ 38} Accordingly, under this primary hypothetical scenario, the activities in Mosier Yard would not constitute rail transportation. The city's eminent-domain action would therefore not be preempted by the ICCTA under the as-applied analysis.

### *Future Unspecified Use Is Too Vague to Be Considered*

{¶ 39} Under Youngstown Railway's secondary hypothetical scenario, we also hold that there is no preemption under the ICCTA. Youngstown Railway claims that it wants to use Mosier Yard in the future for expansion and development in order to accommodate the growing interstate railway business in the area. However, Youngstown Railway has no concrete plans to put these hypothetical plans into execution and in fact is selling the property to Mosier Yard. Without anything more specific, Youngstown Railway's evidence of a general desire for future development is not enough to establish that the property will be used for railway transportation.

{¶ 40} While it is acceptable and sometimes necessary to consider a railway company's future plans when determining if the ICCTA applies to an eminent-domain action, it is also necessary to consider whether it is likely that the railway company's plans "will come to fruition." *Lincoln*, 414 F.3d at 862. Keeping in mind that Youngstown Railway bears the burden of demonstrating that the city's action is preempted by the ICCTA, mere "conclusory allegations are not sufficient to support removal." *Bayou DeChene Reservoir Comm. v. Union Pacific RR. Corp.*, W.D.La. No. 09-0429, 2009 WL 1604658, at *3-4 (June 8, 2009); *see also Texas Cent. Business Lines Corp. v. Midlothian*, 669 F.3d 525, 535 (5th Cir.2012) ("The mere prospect that there will be less space going forward, on this extensive tract, without definite plans to develop, and without an

explanation of how future projects would be affected does not amount to an unreasonable burden [on rail transportation]").

{¶ 41} It is true that in some cases it has been appropriate to look to a railway company's future intentions, even without concrete plans, in order to determine whether a taking would eventually unreasonably interfere with railway transportation. *Lincoln* at 862; *Norfolk S. Ry.—Petition for Declaratory Order*, STB Finance Docket No. 35196, 2010 WL 691256 (Feb. 26, 2010). However, those cases are distinguishable from the one at hand because they involved already existing tracks or rights-of-way. Both *Lincoln* and *Norfolk S.* stand for the principle that a locality cannot justify an eminent-domain action over a rail line or right-of-way merely because the line is not currently being used. This principle does not extend to an undeveloped parcel of land containing no rail line and no right-of-way.

{¶ 42} Here, Youngstown Railway is not being asked to justify the continued existence of an already developed rail line. Instead, the property sought to be acquired is vacant land, with which Youngstown Railway has done nothing in terms of development from its purchase of the land in 1997 up to the present day. It is far from evident that Youngstown Railway's alleged intentions for the future will ever actually be executed. We are therefore not confronted with a situation in which the city's eminent-domain action could forever close off the use of a previously constructed rail line.

{¶ 43} Youngstown Railway's alternative future plans are too vague and speculative to allow us to conclude that the city's eminent-domain action would unreasonably interfere with railway transportation. Consequently, Youngstown Railway has failed to establish that the city's eminent-domain action would be preempted by the ICCTA.

**Conclusion**

**{¶ 44}** We hold that the Trumbull County Court of Common Pleas had jurisdiction to determine the question of ICCTA preemption. Applying the generally accepted fact-intensive test for as-applied preemption under the ICCTA, we hold that the city's proposed eminent-domain action against an undeveloped portion of Youngstown Railway's property, which does not contain any tracks or rights-of-way and does not have any concrete projected use that would constitute rail transportation by a rail carrier, is not preempted under the ICCTA.

**{¶ 45}** For these reasons, we reverse the appellate court's decision finding preemption by the ICCTA and committing the matter to the STB, and we remand the case to the trial court for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Frank R. Bodor; and Brian C. Kren, Girard City Law Director, for appellant.

Manchester, Bennett, Powers & Ullman, L.P.A., C. Scott Lanz, and Thomas J. Lipka, for appellee Youngstown Belt Railway Company.

Michael DeWine, Attorney General, Alexandra T. Schimmer, Solicitor General, and Michael L. Stokes, Assistant Attorney General, for amicus curiae, state of Ohio.

_____